IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE



**FILED**

**April 12, 1999**

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| TERRY LYNN KING | ) | **FOR PUBLICATION** |
| | ) | |
| Appellant, | ) | **FILED: <u>April 12, 1999</u>** |
| | ) | |
| v. | ) | KNOX COUNTY |
| | ) | |
| STATE OF TENNESSEE | ) | Hon. Mary Beth Leibowitz |
| | ) | |
| Appellee. | ) | NO. 03S01-9801-CR-00001 |
| | ) | |
| | ) | (Post Conviction, Capital) |
| | ) | |

For the Appellant:

Charles W. Fels &
Wade V. Davies
Ritchie, Fels & Dillard
Knoxville, Tennessee

Kenneth F. Irvine, Jr.
Eldridge, Irvine & Hendricks
Knoxville, Tennessee

For the Appellee:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

John P. Cauley
Assistant Attorney General
Nashville, Tennessee

Randall Eugene Nichols
District Attorney General

OPINION

**AFFIRMED**

**BARKER, J.**

**OPINION**

We granted this post-conviction appeal to review the appellant's conviction of felony murder and the sentence of death based, in part, on the felony murder aggravating circumstance. The appellant requests this Court to clarify the Howell harmless error analysis used in State v. Hines, 919 S.W.2d 573, 583-84 (Tenn. 1995), and to address whether the Howell analysis requires a comprehensive review of cumulative errors in the record. The appellant also alleges ineffective assistance of counsel and contends that his case should have been severed from his co-defendant's under Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

For the reasons that follow, we conclude that any Middlebrooks error in this case, for use of the felony murder aggravating circumstance, was harmless beyond a reasonable doubt. Although Howell requires us to review the record for factors that may have influenced the imposition of the death sentence,[1] we hold that such review need not incorporate a comprehensive analysis of alleged cumulative errors. We find no reversible error and affirm the judgments of the trial court and the Court of Criminal Appeals.

**BACKGROUND**

The appellant's criminal history reveals a pattern of violent behavior that has ultimately lead him to a position on death row. In this case, the appellant and co-defendant Randall Sexton[2] were convicted of felony murder and aggravated robbery

---

[1]State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993).

[2]Mr. Sexton was tried together with the appellant for the crimes against Ms. Smith. Mr. Sexton was sentenced to life in prison plus a term of 125 years for his convictions. His appeal is not now before this Court.

of Diana K. Smith.[3]  The evidence at trial was that on July 31, 1983, the appellant and Ms. Smith spent the afternoon together drinking beer, ingesting hallucinogenic drugs, and engaging in sexual intercourse.  At some point during the day, Ms. Smith accused the appellant of raping her.  The appellant responded that "he knew what he would do," whereupon he forced Ms. Smith into the trunk of her own car and drove to Mr. Sexton's residence.  With Mr. Sexton following in a separate vehicle, the appellant drove Ms. Smith to a remote location in Knox County.  The appellant ordered Ms. Smith to get out of the trunk and lie on the ground.  He then shot her at close range in the back of the head with Mr. Sexton's high-powered rifle.

After the two men disposed of the body, they took Ms. Smith's car and other items that she had on her person.  The body was discovered several days later in the Asbury quarry in Knox County.  During the police investigation, both the appellant and Mr. Sexton made written statements to the police implicating themselves in the crime.

At the sentencing phase of trial, the jury sentenced the appellant to death based upon four aggravating circumstances:  (1) the murder was committed by the appellant while he was engaged in committing rape, robbery, larceny, or kidnapping of the victim; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the appellant; and (4) the appellant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.  Tenn. Code Ann. § 39-2-203 (i) (7), (5), (6), and (2) (1982).

---

[3]The appellant was also convicted of aggravated kidnapping based upon the same criminal episode.  The trial court granted a judgment of acquittal on that conviction.

Following his unsuccessful direct appeal to this Court,[4] the appellant filed a post-conviction petition[5] alleging, among other things, that he was convicted and sentenced to death based in part on an invalid felony murder aggravator, that his trial counsel were ineffective, and that his joint trial with Mr. Sexton violated Cruz v. New York. In addition, he argued that he was entitled to a new trial and/or a new sentencing hearing based upon cumulative errors in the record.

The trial court conducted an evidentiary hearing and dismissed appellant's post-conviction petition. The trial court found a Middlebrooks error based upon appellant's conviction of felony murder and the State's use of the felony murder aggravating circumstance. However, the court determined that the error was harmless in light of the three remaining valid aggravating circumstances. On the joint trial issue, the court found that even if Cruz v. New York applies retroactively, the joint trial with Mr. Sexton was harmless error based upon the overwhelming evidence of appellant's guilt. Lastly, the court found that the appellant failed to prove that his counsel were ineffective at trial or on direct appeal. The trial court found no reversible error and held that appellant's claim of cumulative error was without merit.

The Court of Criminal Appeals affirmed the judgment of the trial court. The intermediate appellate court determined, however, that there was no Middlebrooks error because the underlying felony used to support the felony murder conviction may have differed from the felonies found by the jury to support the felony murder aggravator. The court noted that the felony murder conviction was based upon the kidnapping and murder of Ms. Smith. The possible underlying felonies listed to support the felony murder aggravator were kidnapping, rape, larceny, and robbery.

---

[4]State v. King, 718 S.W.2d 241 (Tenn. 1986).

[5]The appellant filed his post-conviction petition under the pre-1995 Post Conviction Procedure Act. Tenn. Code Ann. § 40-30-101 to -124 (Repealed 1995).

4

Relying in part on this Court's decision in State v. Hines, 919 S.W.2d 573, 583-84 (Tenn. 1995), the intermediate appellate court concluded that the appellant was in a class of death eligible offenders demonstrably smaller and more blameworthy than the class addressed in Middlebrooks. The court, therefore, held that the use of the felony murder aggravator was not error in this case.

**DISCUSSION**

In this post-conviction proceeding, the appellant has the burden of proving the allegations in his petition by a preponderance of the evidence. State v. Benson, 973 S.W.2d 202, 207 (Tenn. 1998).[6] The factual findings of the trial court are conclusive on appeal unless the evidence preponderates against the judgment. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); State v. Buford, 666 S.W.2d 473, 475 (Tenn. Crim. App. 1983).

**I.**

The appellant first contends that the Court of Criminal Appeals misapplied the principles announced in Hines, 919 S.W.2d at 583-84, to determine that there was no Middlebrooks error. He argues that the court effectively created a new non-statutory aggravating circumstance that "the accused committed the murder in the course of committing multiple felonies."

It is now a well-known principle that when a defendant is convicted of first degree murder solely on the basis of felony murder, the use of the felony murder aggravating circumstance to support a death sentence, without more, fails to

---

[6]Under the new post-conviction procedure act, petitioners have the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997).

5

sufficiently narrow the class of death-eligible offenders. State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992).[7] The majority of the Court in Middlebrooks based that decision upon a determination that the felony murder aggravator contains language that is virtually identical to the statutory definition of felony murder.[8]

At the time of the killing in this case, the felony murder aggravator read as follows:

> (7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-2-203(i)(7) (1982).[9]

In comparison, Tenn. Code Ann. § 39-2-202(a) (1982) defined first degree felony murder as "every murder ... committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb."

---

[7] There has been some question concerning whether the decision in Middlebrooks was required under the cruel and unusual punishment provision of the federal constitution. Following Middlebrooks, a majority of this Court has held that the Middlebrooks decision was based independently on Article I, section 16 of the Tennessee Constitution. State v. Bigbee, 885 S.W.2d 797, 816 (Tenn. 1994); Howell, 868 S.W.2d at 259 n.7.

[8] Justice Drowota and former Justice O'Brien dissented as to the holding in Middlebrooks. See 840 S.W.2d at 347-350 (Drowota, J., dissenting).

[9] The felony murder aggravator has since been amended to provide that, "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any" of the enumerated felonies. Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1995).

The duplicative language in the above provisions has served as the basis for finding Middlebrooks error in cases where the underlying felony used to support a felony murder conviction was also used to support the felony murder aggravator. In a case that followed Middlebrooks, however, this Court addressed for the first time whether it was error to rely on the felony murder aggravator when an additional or different felony supported the aggravating circumstance, but was not the underlying felony for the felony murder conviction. State v. Hines, 919 S.W.2d 573 (Tenn. 1995).

The defendant in Hines was convicted of felony murder based upon the victim's death during the course of an armed robbery. Id. at 576. The jury sentenced the defendant to death based in part on the felony murder aggravating circumstance. Id. at 577.[10] The felonies relied upon to support the felony murder aggravator were robbery, larceny, and rape. Id. at 583.

The Court in Hines reiterated concern for applying aggravating circumstances and any mitigating circumstances so as to narrow the class of death eligible offenders in capital cases. Id. at 583. A majority of the Court[11] determined, however, that when a felony not underlying the felony murder conviction is used to support the felony murder aggravator, there is no duplication, and hence the narrowing function is sufficiently performed. Id. The majority held that absent any duplication, there is no constitutional prohibition against the use of the felony murder aggravator to support the imposition of the death penalty for a felony murder conviction. Id.

---

[10]The jury also found that the defendant had been previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person, and that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Id. (referring to Tenn. Code Ann. § 39-2-203(i)(2),(5) (1982)).

[11]O'Brien, Sp., J. wrote for the majority, concurred in by Anderson, C.J., Drowota and Birch, J.J. Former Justice Reid dissented. See Hines, 919 S.W.2d at 584-88 (Reid, J., dissenting).

The majority in <u>Hines</u> noted that duplication may have occurred in that case since armed robbery was the basis for the felony murder conviction and was also included for the jury's consideration of the felony murder aggravator.  <u>Id.</u>  The majority, therefore, conducted the harmless error analysis under <u>Howell</u> to address the possible <u>Middlebrooks</u> error.  <u>See</u> <u>Hines</u>, 919 S.W.2d at 583-84.

The appellant's case is remarkably similar to the circumstances in <u>Hines</u>.  The appellant was convicted of felony murder based upon his act of killing Ms. Smith during the course of a kidnapping.  The felonies relied upon to support the felony murder aggravating circumstance were kidnapping, rape, larceny, and robbery.

The Court of Criminal Appeals relied on <u>Hines</u> to address whether the use of the felony murder aggravator violated <u>Middlebrooks</u>.  The court properly noted that the jury may have relied on the felonies of rape, larceny, and robbery to impose the felony murder aggravator, which would have avoided any duplication problem under <u>Middlebrooks</u>.  However, the court went further to conclude that there was no <u>Middlebrooks</u> error since the appellant was engaged in multiple felonies at the time he killed Ms. Smith.  According to the court, the appellant was in a class of death-eligible offenders smaller and more blameworthy than the class at issue in <u>Middlebrooks</u>.

We agree with the Court of Criminal Appeals that the appellant is a death eligible offender.  However, to the extent that the court found no <u>Middlebrooks</u> error, we must respectfully disagree.  As discussed in <u>Hines</u>, the mere fact that multiple felonies were listed by the State to support the felony murder aggravator does not eliminate the possible duplication error under <u>Middlebrooks</u>.  Where, as in the instant case, there is no clear showing of which felonies the jury considered to impose the felony murder aggravator, we cannot presume that no <u>Middlebrooks</u> error occurred.  In appellant's case, the jury may have relied on the kidnapping felony in part to convict

8

the appellant of felony murder and to find the felony murder aggravating circumstance. If that occurred, then the use of the felony murder aggravator is error under Middlebrooks.

On the premise that the jury improperly relied on the kidnapping felony at sentencing, we shall conduct a Howell harmless error analysis. The Howell analysis requires us to determine beyond a reasonable doubt whether the appellant's sentence would have been the same had the jury given no weight or consideration to the felony murder aggravating circumstance. 868 S.W.2d at 260-62. It is important to examine the entire record for the presence of factors which potentially influenced the sentence imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecution's argument at sentencing, the evidence admitted to establish the felony murder aggravator, and the nature, quality, and strength of any mitigating evidence. Id. at 261.

Our examination of the record in accordance with the foregoing principles demonstrates that the use of the felony murder aggravator, if error, was harmless beyond a reasonable doubt. The remaining three aggravating circumstances were properly applied and strongly supported by the evidence.[12] First, there is no dispute that the appellant has prior felonious convictions that involve violence or threat of violence to the person. See Tenn. Code Ann. § 39-2-203(i)(2) (1982). In 1983, the appellant was convicted of felony murder and aggravating kidnapping based upon a criminal episode in Grainger County. Moreover, he was convicted of assault with intent to commit aggravated kidnapping for criminal conduct in Knox County that occurred only three days after the murder of Ms. Smith.

---

[12]It is important to note that under the law in effect at the time of this trial, a jury could have imposed a sentence of death upon finding only one aggravating circumstance beyond a reasonable doubt, so long as there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance. Tenn. Code. Ann. § 39-2-203(g) (1982). In this case, the jury found four aggravating circumstances.

The appellant argues that the (i)(2) aggravator was somehow tainted by the State's introduction of his juvenile convictions at the sentencing hearing. We disagree. As this Court determined on direct appeal, the introduction of the juvenile records, while improper, had no bearing on the outcome of appellant's trial. His prior convictions as an adult reflect complete disregard for human life and strongly support the (i)(2) aggravator. The use of the juvenile record was harmless, and the (i)(2) aggravator was properly used to impose the death sentence.

Second, as the appellant admitted both before trial and at the sentencing hearing, he kidnapped and murdered Ms. Smith to avoid an allegation and possible charge of rape. See Tenn. Code Ann. § 39-2-203(i)(6). The evidence at trial reflected that the appellant spent the afternoon with Ms. Smith drinking alcohol, ingesting drugs, and having sexual intercourse. At some point, Ms. Smith asked the appellant why he had raped her. There is no dispute that appellant's subsequent criminal conduct against Ms. Smith was a reaction to Ms. Smith's accusation.

The appellant nevertheless contends that the (i)(6) aggravator was tainted by the testimony of appellant's ex-girlfriend, Lori Eastman Carter. Ms. Carter testified during the guilt phase that the appellant had previously assaulted her and attempted to kill her. On direct appeal, this Court determined that the testimony should have been excluded as irrelevant, but that any error was harmless beyond a reasonable doubt. The appellant now claims that the testimony improperly served as the factual basis for the (i)(6) aggravator. We disagree. The appellant's own admissions fully support the aggravator without any consideration of Ms. Carter's testimony. There was no error in the jury's finding of that aggravator.

Third, the jury found that the murder was especially heinous, atrocious, and cruel in that it involved torture or depravity of mind. See Tenn. Code Ann. § 39-2-

10

203(i)(5).  The appellant argued on direct appeal and contends now that this aggravator is invalid because the trial court did not define "torture."  In the direct appeal, this Court held that there was no prejudicial error in the trial court's charge on the (i)(5) aggravator.  The appellant offers no valid reason why that determination should be disturbed now.

As the Court of Criminal Appeals noted, the evidence supports the jury's finding that the murder was especially heinous, atrocious, and cruel.  The appellant kept Ms. Smith trapped in the trunk of her own car for at least forty-five (45) minutes before the shooting.  After driving to the remote wooded area, the appellant ordered Ms. Smith to get out of the trunk and lie face down in the weeds.  The appellant had the rifle in his possession and began placing brush on top of Ms. Smith.  She begged him not to shoot her and offered money to spare her life.  When she asked about her fate, the appellant responded that other guys were coming to have sexual intercourse with her.

The appellant ordered Ms. Smith to look away from him while she was lying in the weeds.  He then shot her at close range in the back of the head.  We agree with the courts below that the manner of Ms. Smith's death involved severe mental pain and anxiety as contemplated by the (i)(5) aggravator and as defined by this Court in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985).

The next step under the Howell analysis is to review whether the prosecution placed undue emphasis on the felony murder aggravator during the closing argument at sentencing.  The record reflects that the prosecution referred to four aggravating circumstances during his closing argument.  He emphasized the manner in which the jury was to consider and weigh the aggravating circumstances together with any evidence of mitigation.  In briefly discussing the aggravators, the prosecution mentioned the felony murder aggravator only once in the context of the closing

11

argument. No more weight or emphasis was given to that aggravator than was given to the other three aggravating circumstances.

Moreover, aside from evidence at the guilt phase of trial, no additional evidence was submitted by the prosecution to establish the felony murder aggravator. At the sentencing hearing, the prosecution presented evidence only of appellant's previous convictions in Grainger County and Knox County. Therefore, we conclude that the prosecution did not rely unduly or introduce improper evidence concerning the felony murder aggravator at sentencing.

Lastly, under Howell, we must review the nature, quality, and strength of any mitigating evidence in appellant's case. At the sentencing hearing, the appellant relied on four mitigating circumstances: (1) the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance; (2) the victim was a participant in the appellant's conduct or consented to the act; (3) the appellant was only twenty-one years old at the time of the crime; and (4) the capacity of the appellant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment. Tenn. Code Ann. § 39-2-203(j)(2), (3), (7), (8) (1982).

The appellant emphasized the detrimental effects of alcohol abuse and mind altering drugs, such as LSD and quaaludes. There was evidence that the appellant had been taking those substances on the day of the murder. Also, the appellant presented evidence of his social history through his own testimony and the testimony of family members, a childhood friend, and a guidance counselor from his former high school. The evidence showed that the appellant suffered emotional trauma and

12

became involved in excessive drug use at an early age, following the death of his father. By the age of fourteen, the appellant was a regular user of cocaine, valium, and alcohol. He had a poor academic record during his school years and he dropped out of high school after failing the ninth grade.

The jury considered the above evidence and found beyond a reasonable doubt that it did not outweigh the strong showing of aggravating circumstances. After our independent review of the record, we are confident that the weighing of the mitigating evidence against the three remaining aggravators would have resulted in the same sentence of death. Accordingly, we conclude that appellant's sentence of death would have been the same had the jury given no weight or consideration to the felony murder aggravator and affirm the capital sentence.

## II.

We shall next address whether the Howell analysis requires a comprehensive review of the cumulative effect of errors in the record, including errors that have already been previously determined, or waived, on direct appeal. The appellant contends that there are numerous "harmless" errors in the record, that when considered cumulatively and in the context of Howell, render his death sentence fundamentally unfair and invalid.

The appellant essentially asks this Court to conduct a harmless error analysis within the context of the Howell harmless error analysis. This we decline to do. As we discussed above, the Howell analysis is conducted in cases where the jury's consideration of the felony murder aggravator constitutes error under Middlebrooks. The crux of the Howell analysis is to review the record to determine whether the

13

appellant's sentence of death is appropriate based upon the relative strengths and weaknesses of the valid aggravating circumstances and any mitigating circumstances. We focus upon those circumstances, including the evidence used to support them, and determine beyond a reasonable doubt whether the sentence would have been the same had the jury given no weight or consideration to the felony murder aggravator.

In conducting the Howell analysis, courts must conduct an intensive review of the sentencing phase of trial to address the strength of the remaining aggravating circumstances, the nature, quality and strength of any mitigating evidence, the prosecution's argument at sentencing, and the evidence used to establish the felony murder aggravator. Assignments of error concerning the above factors are certainly relevant to the analysis under Howell.

We have conducted the Howell analysis in this case, addressing the alleged errors as to the remaining aggravating circumstances and other factors at sentencing. Based upon our review, we concluded beyond a reasonable doubt that the appellant's sentence would have been the same regardless of the felony murder aggravator. That deliberate process has been approved by this Court in Howell and Hines to preserve the principles of individualized sentencing and to ensure that the appellant is a death-eligible offender. We find no reason to modify that analysis here.

The Howell decision was never intended to be a vehicle for reviewing or relitigating harmless errors or errors that have been previously determined or waived. Particularly, in post-conviction proceedings, courts must adhere to the limitations set forth in the Post-Conviction Procedure Act. Under the Act of 1989, a post-conviction hearing may extend to "all grounds the petitioner may have, except those grounds which the court finds should be excluded because they have been waived or previously determined." Tenn. Code Ann. § 40-30-111 (Repealed 1995).

14

A ground for relief is "'waived' if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-112(b)(1).[13] A ground for relief has been "'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-112(a).

With those principles in mind, we decline to give comprehensive review to any errors that were adjudicated on direct appeal or errors that the appellant could have, but did not raise until this proceeding. Having determined that any sentencing error is harmless beyond a reasonable doubt, we again conclude that appellant's sentence of death should stand.

### III.

The appellant next contends that the trial court's refusal to sever his case from Mr. Sexton's was prejudicial error requiring a reversal of his conviction under Cruz v. New York. Neither the appellant nor Mr. Sexton testified during the guilt phase of trial. The State, however, introduced into evidence a written confession made by each defendant during the police investigation. The trial court instructed the jury that each confession could be considered as evidence only against the confessor. The appellant argues that the admission of Mr. Sexton's confession violated his Confrontation Clause rights and constitutes reversible error under Cruz.

In the direct appeal, this Court upheld the admission of Mr. Sexton's confession based on the United States Supreme Court's decisions in Bruton v. United States, 391

---

[13]Section (b)(2) further provides that "[t]here is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived." Tenn. Code Ann. § 40-30-112(b)(2).

15

U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). The well-established rule from Bruton is that a defendant is deprived of his Confrontation Clause rights when a codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. In Parker, the Supreme Court modified the reach of Bruton where multiple defendants in a joint trial each have a confession that is introduced into evidence. The Court held that there was no Confrontation Clause violation under Bruton if the defendant's own confession recited essentially the same facts as the confession of the nontestifying codefendant. 442 U.S. at 73, 99 S.Ct. at 2140.[14]

Relying on the decision in Parker, this Court examined the confessions of both the appellant and Mr. Sexton and determined that they were "interlocking in the crucial facts of time, location, felonious activity, and awareness of the overall plan or scheme" of the killing. This Court, therefore, held that there was no Bruton violation and that the trial court did not err in denying the severance motion under Rule 14(c) of the Tennessee Rules of Criminal Procedure.

Following appellant's direct appeal, the United States Supreme Court decided the case of Cruz v. New York. In Cruz, the Court overruled the "interlocking" confession exception in Parker, reasoning that a codefendant's confession may be "devastating"[15] to the defendant and violative of the Confrontation Clause, even if it overlaps material facts in a confession made by the defendant. Cruz, 481 U.S. at 193,

---

[14]A plurality of the Court in Parker reasoned that when the defendant has confessed to the crime, his case is already "devastated," so that the codefendant's confession "will seldom, if ever, be of the 'devastating' character referred to in Bruton," and impeaching the codefendant's confession on cross-examination "would likely yield small advantage." Parker, 442 U.S. at 73, 99 S.Ct. at 2139.

[15]The Court acknowledged that the codefendant's confession may actually enhance the reliability of the defendant's confession, and increase the likelihood of a conviction, where the two confessions are interlocking. Cruz, 481 U.S. at 193, 107 S.Ct. at 1719.

16

107 S.Ct. at 1719. The Court, therefore, held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, ... the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." Id.

The appellant requests this Court to apply Cruz retroactively and to hold that the admission of Mr. Sexton's confession was constitutional error. Having carefully reviewed the progeny of cases under Bruton, we find it unnecessary to determine whether Cruz has retroactive application in this case. We are confident that even under the principles of Cruz, the admission of Mr. Sexton's confession was harmless beyond a reasonable doubt. Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728-29, 23 L.Ed.2d 284 (1969); State v. Porterfield, 746 S.W.2d 441, 446 (Tenn. 1988), *cert. denied*, 486 U.S. 1017 (1988).

Mr. Sexton's written confession described his involvement in the killing from the time the appellant arrived at his residence with Ms. Smith locked in the trunk of her own car. In his confession, Mr. Sexton stated that the appellant was not going to release Ms. Smith because he was afraid "he would get in the same mess he got into with Lori [Eastman Carter]." Mr. Sexton admitted that the appellant took his high-powered rifle and that the two men drove separately out to a rural area in Knox County.

Before reaching their destination, both Mr. Sexton's vehicle and the vehicle driven by the appellant ran out of gasoline. In his confession, Mr. Sexton stated that he purchased five (5) dollars of gasoline for his car and five (5) dollars of gasoline in a

separate container for Ms. Smith's car. The two men then drove a few miles up the road to a wooded area where the shooting was to occur. Mr. Sexton's confession describes in pertinent part:

> I left and took a funnel back to the Publix station and got me a Coke. I drove back down to the creek and drove into the wooded area. I saw the Camaro. It was stuck. I helped [the appellant] get it unstuck. Terry told me he had already killed the girl. Terry told me he laid the girl down on her stomach, and that while she was begging for him not to, he shot her in the back of the head. Terry told me he had covered the body up with some weeds.

Having carefully reviewed the written confessions made by the appellant and Mr. Sexton, we again note that they are substantially similar as to the facts and circumstances involving the murder. The appellant's confession, however, contains greater detail concerning the actual shooting. His confession provides in pertinent part:

> I pulled up in a wooded area and got stuck. I made the girl get out of the trunk. I had loaded the rifle and was pointing it at her. This [sic] was daylight. And I took the girl over into some weeds and made her lay down. She asked me what I was going to do, if I was going to kill her. I said, no, some more guys are going to screw you. I started covering her up with weeds. I told her this was so she couldn't be seen. I still had the gun. She was laying facedown. I picked up the rifle, held it approximately 3 feet from the back her head and shot her. [Mr. Sexton] wasn't there. We got the [victim's car] unstuck after [Mr. Sexton] came back. We then went through her personal belongings. I burned her pictures and I.D. and panties. [Mr. Sexton] walked over and looked at her. We started to leave, but decided to bury her. We started digging a grave next to the fence, but the ground was too hard, and we quit. We discussed what to do and decided to wrap her in a tent [Mr. Sexton] had in the back of his car, [sic] weight her and put her in the water. We decided we would do it the next morning.

It is clear that the admission of Mr. Sexton's confession into evidence would have constituted a <u>Bruton</u> violation under the rationale of <u>Cruz</u>. Nevertheless, the mere finding of a <u>Bruton</u> error in the course of the trial "does not automatically require reversal of the ensuing criminal conviction." <u>Schneble</u>, 405 U.S. at 430, 92 S.Ct. at

18

1059. In cases where the properly admitted evidence of guilt is overwhelming, and the prejudicial effect of the codefendant's confession is insignificant by comparison, then the improper admission is harmless beyond a reasonable doubt. Id. See also Porterfield, 746 S.W.2d at 446.

In this case, the objective evidence against the appellant was overwhelming. Jerry Childers, an acquaintance of the appellant, testified that the appellant came to his house on August 1, 1983, to inquire if he knew anyone who wanted to buy parts from a 1979 Camaro. Mr. Childers testified that the appellant confessed to having killed the woman who owned the Camaro after she threatened to charge him with rape.[16] The appellant told Mr. Childers that he ordered the woman to get out of the trunk of her own car and to lie face down on the ground. The woman begged the appellant not to shoot her and offered him money. The appellant told Mr. Childers that he told the woman to turn away from him, and when she complied, he shot her in the back of the head.

Mr. Childers testified that a few days after talking to the appellant, he went to the location where appellant had said the shooting occurred. While walking in the area, he found an object with hair on it. He then gave the information he had to Detective Herman Johnson of the Knox County Sheriff's Department and to Agent David Davenport with the Tennessee Bureau of Investigation. The two officers met Mr. Childers at the professed shooting location and searched the area, finding pieces of bone, hair, and bloodstains. A later more thorough search revealed bullet fragments and additional bone fragments.[17]

---

[16]The appellant testified at the post-conviction hearing that he had told four people about the shooting, including Mr. Childers, before he was questioned by police.

[17]Additional evidence was provided by Agent Davenport and Tommy Heflin, a firearms examiner for the T.B.I. Agent Davenport testified that after the appellant made a statement, appellant took him and other officers to the place where the Camaro was hidden and to where he had hidden the vehicle's license plate. Also, appellant showed the officers where the shooting occurred and where he and Mr.

There is no question that the evidence of appellant's guilt was overwhelming even without consideration of the two written confessions. Considering the above evidence, coupled with appellant's properly admitted confession, any Bruton error was harmless beyond a reasonable doubt.

## IV.

The appellant next contends that he received ineffective assistance of counsel at both the trial and the direct appeal. To prevail on a claim of ineffective counsel in this proceeding, the appellant must prove by a preponderance of the evidence that the advice given or services rendered by his counsel fell below the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 903, 936 (Tenn. 1975). He must also demonstrate prejudice by showing a reasonable probability that but for counsels' error, the result of the trial proceeding would have been different. Strickland v. Washington, 466 U.S. 669, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996).

The appellant first claims that his trial counsel abandoned the defense theory of voluntary intoxication after having introduced it to the jury during the opening statement.[18] Defense counsel Robert Simpson stated during his opening remarks that Ms. Smith willingly spent time with the appellant and appellant's cousin, Don King, on the day of the killing. While at Don King's trailer, the three drank large quantities of

Sexton had submerged the body in the quarry. Mr. Heflin testified that, based upon his examination, at least two bullets had been fired from a rifle with the same firing characteristics as Mr. Sexton's rifle. He further stated that the intact metal bullet jacket found at the scene had been fired from Mr. Sexton's rifle.

[18]The appellant was represented at trial by attorneys Robert R. Simpson and Joseph M. Tipton. Mr. Tipton has been a respected judge on the Tennessee Court of Criminal Appeals since 1990. He did not testify at the post-conviction hearing.

alcohol and ingested various mind-altering drugs, including LSD and quaaludes. Counsel stated that:

> We think the proof will show that whatever happened to Mrs. Smith, Mr. King's involvement was the product of an incredible quantity of intoxicants. And we think the proof will show that he cannot be held legally responsible for all of his actions to the degree the State would ask you, simply because of the vast quantities of intoxicants that he consumed. And the proof is going to be very clear on that point.

During the guilt phase of trial, proof of appellant's alcohol and drug consumption was admitted into evidence through the testimony of Jerry Childers[19] and the admission of appellant's police confession. Counsel Simpson testified at the post-conviction hearing that he did not call Don King to testify at the guilt phase because he strategized that Don King's testimony would hurt the defense.[20] Moreover, counsel stated that he decided to abandon the use of voluntary intoxication to defend appellant's actions after the testimony of appellant's ex-girlfriend, Lori Eastman Carter.

Ms. Carter testified for the prosecution, over the objection of defense counsel, that the appellant had attempted to kill her on October 13, 1982. According to Ms. Carter, the appellant hit her with a slapstick numerous times while repeatedly asking her "how it felt to be dying, so that the next woman he killed he would know how she felt." Ms. Carter testified that the appellant was sober when he attacked her with the slapstick.

Counsel Simpson testified at the post-conviction hearing that Ms. Carter's testimony was unexpected and devastating to appellant's case. Counsel had

---

[19]Mr. Childers was an acquaintance of the appellant. He testified at trial that the appellant came to his house on August 1, 1983, to inquire whether he would purchase automotive parts from a 1979 Camaro. During his visit, the appellant told Mr. Childers that he had killed the owner of the vehicle after she threatened to charge him with rape. The appellant confessed the details of the killing to Mr. Childers, including the events that preceded the crime.

[20]The appellant had apparently confessed his involvement in the murder to Don King.

21

attempted to contact Ms. Carter for an interview before trial, but was unable to locate her. During appellant's case in chief, counsel attempted to rebut her testimony by calling appellant's cousin, James King, who testified that he and the appellant had taken Ms. Carter to St. Mary's Hospital for treatment. In addition, the defense called Karen Greeg, Ms. Carter's sister, who testified that Ms. Carter could not be believed, even under oath.

Counsel Simpson testified that the theory of voluntary intoxication was rendered futile after Ms. Carter's testimony. Counsel decided to challenge Ms. Carter's credibility during the guilt phase of trial and to rely on the evidence of intoxication during the sentencing.

The appellant relies on State v. Zimmerman, 823 S.W.2d 220, 224-26 (Tenn. Crim. App. 1991), to argue that the change in the defense theory constituted ineffective assistance of counsel. His reliance on that decision is misplaced. In Zimmerman, the defense theorized initially that the defendant was a battered and abused wife who had killed her husband in self defense. Id. at 224. Opening statements were made to the jury based upon that theory, and the defense planned to call the defendant as a witness. Id. at 224-25.

During the course of the trial, however, counsel advised the defendant to "shut down" the defense and to decline from testifying. Id. Zimmerman's counsel apparently reasoned that a conviction was inevitable, even though no surprise or new evidence had been presented by the State. Id. The Court of Criminal Appeals held that the sudden change in defense strategy constituted ineffective assistance of counsel under the circumstances of that case. Id. at 224. The court particularly noted that nothing changed or transpired during the course of trial to warrant counsel's peremptory abandonment of the sound defense theory. Id. at 224, 226.

22

In appellant's case, Counsel Simpson testified that he revised the defense theory solely in response to the surprise testimony of Ms. Carter. Counsel objected to the introduction of her testimony, but was forced to deal with it after the trial court allowed it into evidence. Although we acknowledge that defense attorneys should strive to present a consistent theory of defense at trial, we must avoid judging the tactical decisions of counsel in hindsight. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). We have reviewed the circumstances from counsel's perspective at the time and conclude that the change in strategy does not rise to the level of ineffective assistance.

The appellant next contends that his counsel were ineffective in failing to obtain the assistance of mental health experts in a timely fashion. Counsel Simpson testified that he began the process of locating a mental health expert on January 9, 1985. At that time, the trial was set to begin on January 21, 1985, but was subsequently postponed to January 23, 1985, due to weather. Counsel obtained the services of Dr. Martin Gebrow, a psychiatrist, on January 15, 1985, and the doctor evaluated appellant on the first day of trial.[21] Counsel subsequently made a strategic decision not to use Dr. Gebrow's evaluation because the appellant had initially lied about the circumstances of the murder[22] and because Dr. Gebrow opined that the appellant was an impulsive person who enjoyed hurting people.

---

[21]Dr. Gebrow retained the services of a psychologist, Dr. David Mindes, to conduct neurological testing of the appellant. Those results were included in the evaluation report submitted to defense counsel by Dr. Gebrow.

[22]At the time of the evaluation, the appellant claimed that Mr. Sexton was responsible for the death of Ms. Smith. The appellant and Mr. Sexton had fabricated this false version of the crime through a suicide letter that Mr. Sexton had left in his jail cell at the Fort Pillow State Prison. In the letter, Mr. Sexton confessed that he was the killer and that the appellant was not responsible for Ms. Smith's death. Mr. Sexton's suicide attempt failed, and both he and the appellant eventually admitted that the information in the letter was false.

23

Counsel Simpson testified at the post-conviction hearing that the defense was unable to obtain a second opinion due to the time constraints of trial. Counsel instead relied upon their own investigation of the appellant, including appellant's familial relations and his social history. Through the testimony of appellant's family and friends,[23] the defense presented evidence that the appellant suffered emotional trauma arising from the death of his father when appellant was eight (8) years old. The appellant became involved in harmful activities, including sniffing gasoline and alcohol abuse, at an early age. By the age of fourteen (14), he was a regular user of alcohol, LSD, cocaine, and valium. His scholastic record was poor and he dropped out of high school after failing the ninth grade.

Dr. Robert Booher, a medical doctor specializing in "addictionology," testified for the defense regarding the harmful effects of LSD and other hallucinogenic drugs. Defense counsel intended to use Dr. Booher's testimony together with evidence that the appellant had taken LSD and quaaludes on the day of the killing. The evidence supported part of the defense's mitigation theory that the murder was committed while the appellant was under an extreme mental disturbance and that appellant's capacity to appreciate the wrongfulness of his actions was substantially impaired by mental disease, defect or intoxication. Tenn. Code Ann. § 39-3-203 (j)(2), (8) (1982).

The appellant argues that the mitigating evidence could have been strengthened if his counsel had initiated the mental health evaluations earlier before the start of trial. He relies on the testimony of psychologist Dr. Pamela Auble, who conducted a mental evaluation of him after his convictions.

---

[23]Defense witnesses in that regard included the appellant, his mother, his brother, a childhood friend, and a guidance counselor from appellant's former high school. Additional witnesses for the defense during the sentencing phase were Dr. Robert Booher and two correctional officers from the Fort Pillow State Prison.

Dr. Auble testified at the post-conviction hearing that the appellant is an impulsive, immature person who has difficulty trusting other people. She opined that based upon appellant's experiences as a child, he also has a strong sense of insecurity and often perceives other people as being hostile towards him. This impulsive and insecure nature, according to Dr. Auble, does not necessarily lead the appellant to act violently. However, she opined that when the appellant is confronted with a stressful situation, he is unable to think clearly before reacting. Dr. Auble further stated that appellant's impulsive behavior is exacerbated by his abuse of drugs and alcohol.

Based upon Dr. Auble's review of the facts in this case, she opined that the appellant unleashed a lifelong build-up of anger and hostility when Ms. Smith accused him of rape.[24] Dr. Auble testified that the appellant probably looked to Mr. Sexton for advice and then carried out the killing because of his impulsive nature and poor judgment.

The trial court reviewed Dr. Auble's testimony and determined that her evaluation provided little information in addition to that previously discovered by Dr. Gebrow. The trial court concluded, therefore, that even if defense counsel had initiated the mental health evaluations earlier, there was no proof that a more favorable report would have been obtained. We find no evidence to preponderate against that finding. Moreover, the record reflects that counsel presented evidence

---

[24]Dr. Auble testified that there were three reasons why the rape accusation triggered appellant's anger: (1) the appellant was fearful of rejection relating back to the death of his father; (2) his sister-in-law had accused him of rape when he was a juvenile; and (3) he had been involved in an abusive relationship with his ex-girlfriend, Lori Eastman Carter.

25

through lay witnesses that was remarkably similar to the information provided by Dr. Auble. Appellant's counsel were not ineffective on this issue.[25]

The appellant next contends that his counsel were ineffective in failing to thoroughly investigate Ms. Smith's past. According to appellant, counsel should have discovered public records concerning a prior false allegation of rape made by Ms. Smith.

Counsel Simpson testified at the post-conviction hearing that he investigated Ms. Smith's past and her involvement with the appellant before the killing. He stated that he did not rely heavily on Ms. Smith's past because he did not want the jury to focus on her as a victim. Counsel was aware that Ms. Smith had lived in McMinn County, but he had no information concerning her prior rape allegation.

We agree with the Court of Criminal Appeals that the prior rape allegation would not have benefited the appellant at trial. If anything, the information would have strengthened the prosecution's evidence of motive against him. Moreover, Ms. Smith's character was not at issue, and there has been no showing that information of her prior rape allegation would have been admissible. Therefore, we cannot say that defense counsel were ineffective for failing to discover it.

The appellant next argues that his counsel were ineffective for failing to ensure the recording of all bench conferences during trial. Counsel Simpson testified that he mistakenly believed the bench conferences were being recorded throughout the trial.

---

[25]We further note that portions of Dr. Auble's testimony supported the State's theory that the appellant committed the murder to avoid prosecution for rape. It is questionable whether defense counsel would have used that information even if it had been available.

26

Only a few of the numerous bench conversations between counsel and the trial judge were preserved for the record.

The State concedes that counsels' failure to preserve all of the bench conferences was an instance of deficient performance.  The State argues, however, that the appellant has not demonstrated any prejudice as a result of the deficiency.  We agree.  In order to demonstrate prejudice here, the appellant must show a reasonable probability that one or more of the unrecorded bench conferences resulted in an adverse ruling that constituted reversible error.  The appellant has not satisfied that burden.  Accordingly, this issue is without merit.

The appellant next contends that counsel should have called him as a witness at the pre-trial suppression hearing.  Counsel Simpson testified that appellant's value and credibility as a witness was seriously undermined by his violent criminal history.  Based upon that premise, counsel believed that any benefit from allowing the appellant to testify at the suppression hearing would have been outweighed by the risk of consequences from the prosecution's in-depth cross-examination.  Counsel testified that he wanted to make the prosecution wait until trial before taking a crack at the appellant.

As correctly noted by both the trial court and the Court of Criminal Appeals, counsel made a tactical decision not to call the appellant as a witness at the suppression hearing.  We will not second guess that strategy on appeal with the benefit of twenty-twenty hindsight.  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065; Hellard, 629 S.W.2d at 9.  Counsel made a calculated decision, and there has been no showing of ineffectiveness.

The appellant next contends that his counsel were ineffective in failing to object to the admission of Mr. Sexton's suicide letter at the sentencing hearing. Mr. Sexton had written the letter in contemplation of suicide while he and the appellant were incarcerated at the Fort Pillow State Prison.[26] During the cross-examination of Mr. Sexton at the sentencing hearing, the State introduced the letter into evidence.

Mr. Sexton testified that he had discussed the contents of the letter with the appellant prior to writing it, and that the appellant had encouraged him to include a statement that he, Mr. Sexton, was responsible for Ms. Smith's death, not the appellant. Appellant's counsel relied on the letter in his closing argument to undermine Mr. Sexton's credibility and to demonstrate that the appellant had not used the letter as a defense. Counsels' strategy in part was to show that the appellant had admitted to the killing and was remorseful.

We agree with the Court of Criminal Appeals that counsel made a tactical decision to use the suicide letter, not only to attack Mr. Sexton's credibility, but to bolster the credibility of the appellant. Again, we decline to second guess the strategy chosen by defense counsel. Counsel knew about the suicide letter before trial and chose to use it during the sentencing phase to undermine the testimony of Mr. Sexton.

The appellant further contends that his counsel were ineffective for failing to challenge on direct appeal the State's improper use of a dismissed juvenile charge during the sentencing phase of trial. At sentencing, the State cross-examined the appellant as to his criminal conduct as a juvenile.[27] His juvenile record revealed two

---

[26]The letter was found at the prison facility after Mr. Sexton attempted to commit suicide.

[27]As mentioned above, the State also introduced appellant's criminal record as an adult. The appellant had a prior conviction of felony murder, aggravated kidnapping, and joyriding. Also, he was convicted of assault with the intent to commit aggravated kidnapping based upon a criminal episode that occurred three days after the murder of Ms. Smith.

armed robbery convictions and a dismissed charge of rape. Appellant's counsel challenged on direct appeal the admission of the two armed robbery convictions, but apparently omitted the State's use of the dismissed rape charge.

This Court has previously held that there is no constitutional requirement for an attorney to raise every issue on appeal. Campbell v. State, 904 S.W.2d 594, 596-97 (Tenn. 1995). See also Jones v. Barnes, 463 U.S. 745, 750-51, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). Counsel is given considerable leeway to decide which issues will serve the appellant best on appeal, and we should not second guess those decisions here. Campbell, 904 S.W.2d at 597.

Counsel Simpson testified that the defense carefully examined the trial record and listed every issue that might have merit on appeal. Counsel included a challenge on direct appeal to the State's use of the armed robbery convictions, and this Court held that admission to be harmless error. Under those circumstances, we cannot say that counsels' omission of the dismissed rape charge was ineffective.

## CONCLUSION

Based upon the foregoing, we conclude that any Middlebrooks error in this case, for use of the felony murder aggravator, was harmless beyond a reasonable doubt. We have addressed the concerns of individualized sentencing under Middlebrooks and Howell and conclude that the appellant was properly sentenced to

29

death.  Finding no reversible error, we affirm the judgments of the trial court and the Court of Criminal Appeals.

Unless stayed by this Court or other appropriate authority, the appellant's sentence of death shall be carried out as provided by law on the 16th day of August, 1999.

_____
WILLIAM M. BARKER, JUSTICE


Concur:

Anderson, C.J.,
Drowota, Birch, Holder, JJ.