IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 1, 2009 Session

**DEREK T. PAYNE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. P-28444     Mark Ward, Judge**

_____

**No. W2008-02784-CCA-R3-PC  - Filed January 15, 2010**

_____

The Petitioner, Derek T. Payne, appeals as of right the Shelby County Criminal Court's denial of his petition for post-conviction relief.  The Petitioner was convicted by a jury of second degree murder and attempted especially aggravated robbery, and he received an effective sentence of thirty-seven years.  On appeal, he argues that the denial of his petition was error because he did not receive the effective assistance of counsel at trial or on appeal. Specifically, he contends that counsel failed to raise or challenge certain jury instruction issues, failed to fulfill promises made during the opening statement, failed to introduce evidence of the victim's past conduct to show that the victim was the first aggressor, and failed to object to the State's improper closing argument.  Additionally, he contends that his sentence was unconstitutionally imposed based on Blakely v. Washington, 542 U.S. 296 (2004).  Following our review of the record and the parties' briefs, we conclude that the Petitioner has not shown that he is entitled to relief.  The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Derek T. Payne.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Summer Morgan, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

On July 1, 1997, the Shelby County Grand Jury returned two indictments against the Petitioner. In the first indictment, he was charged with one count of attempted especially aggravated robbery; in the other two-count indictment, he was charged with first degree premeditated murder and first degree felony murder for the November 24, 1996 killing and attempted robbery of the twenty-three-year-old victim, Brian Pritchard. See State v. Derek T. Payne, W2001-00532-CCA-R3-CD, 2002 WL 31624813, at *1 (Tenn. Crim. App., Jackson, Nov. 20, 2002), perm. to appeal denied, (Tenn. May 19, 2003). Following a jury trial, the Petitioner was convicted of second degree murder and attempted especially aggravated robbery. Id. He was sentenced by the trial court to the maximum terms of twelve years as a Range I, standard offender for the attempted especially aggravated robbery conviction and twenty-five years as a violent offender for the second degree murder conviction, with the sentences to be served consecutively, for an effective sentence of thirty-seven years. Id.

This Court summarized the facts established at trial as follows:

### State's Proof
At the [Petitioner's] trial, Dr. Wendy Gunther, the forensic pathologist who performed the autopsy of the victim's body, testified that the victim died from a gunshot wound to the head in which the bullet entered in front of his left ear, traveled through his head, and lodged in the skull bone behind and below his right ear. In addition to the gunshot wound to the head, which would have been immediately fatal, the victim also suffered what Dr. Gunther characterized as "flesh wound[s]" to both legs, caused by bullets that traveled through the "deep meat" of his thighs but did not hit any blood vessels, bones, or major nerves. She testified that she found three gunshot wounds in the victim's right leg, consisting of one entrance wound and two exit wounds in the thigh that were caused by either a single bullet that broke into two pieces or two bullets that entered at the same place, and two gunshot wounds in his left leg, consisting of an entrance wound and an exit wound in the thigh. The gunshot wounds in both legs occurred, roughly, from the back to the front of the victim's thighs. The wounds to the victim's legs would not have prevented him from standing or running. Dr. Gunther could not determine at what distance the fatal gunshot was fired, what position the victim was in when shot, or whether the gunshot wounds were inflicted by one or two guns. She

said that the victim's blood-alcohol level was 0.11 grams per deciliter, and that his toxicology report revealed no drugs of any kind in his system.

Thomas Hughlett testified that the [Petitioner] was formerly his uncle's stepson and was "like a cousin." On November 24, 1996, he was barbequing at his mother's house in Memphis when the [Petitioner] came by and asked him "to take him on Aubra Street." When he refused, the [Petitioner] pulled two guns out of his clothing and said, "I'm going to kill me a motherfucker and I ain't going back to jail. I'm going to hell." Hughlett agreed on cross-examination that the [Petitioner] was not "acting right," testifying that his eyes looked "glossy" and he appeared to be under the influence of some kind of drug. He was aware that the [Petitioner] had been snorting powder cocaine for a number of months, but did not know if he had used any that day. He conceded, however, that he had told police officers that the [Petitioner] became "crazy" and "a whole different person" when he was on cocaine.

Eric Rogers, a friend of the victim, testified that the victim was with him on the evening of November 24, 1996, as he responded to a page he had received from someone at a residence on Aubra Street. He said that when he pulled his car into the driveway, he saw the [Petitioner's] face at the upstairs window of an apartment belonging to a woman named Nicole. Leaving the victim in his car, he got out and went up to the apartment to find out who had paged him. On his way up, he saw the [Petitioner] sitting on the hallway stairs with Keith Brown. When told by the apartment's occupants that no one there had paged him, he headed back out to his car. He had paused to talk downstairs with a woman named Christine when Brown asked if he had a light. Rogers said that he gave Brown a book of matches, and then started toward his car. He did not see the victim.

Rogers testified that as he was walking to the car, Brown pulled a gun on him and ordered him to "drop it off." He said that he threw his arm up and ran around the car. He slipped and fell, and Brown pulled him up by his shirt and demanded again that he "drop it off." After Rogers had given Brown $142, Brown asked where his car keys were and was told they were in the car. At that point, he heard Brown repeatedly say, "Derek, don't shoot. Derek, don't shoot," and looked around to see the victim and the [Petitioner] on the front porch of the "complex" next door. He then heard two or three gunshots. In response to the gunshots, he ran around Nicole's building. He next saw Brown get into his car and pull out into the street, the [Petitioner] run off the front porch of the duplex and jump into the car, and both men drive off. He

later identified Brown and the [Petitioner] from photographic spreadsheets shown to him by the police.

Rogers testified on cross-examination that he had known the [Petitioner] for about fifteen years, but they were not friends. He said that the [Petitioner] had known his pager number, although acknowledging he had told police two days after the shooting that the [Petitioner] did not. In addition to Nicole, men he knew as "Head" and "Twin" were in Nicole's apartment when he arrived. He did not see the [Petitioner] with a gun when he went up to the apartment, and saw Brown, but not the [Petitioner], when he came back outside the building. He testified that he saw the [Petitioner] and the victim on the porch after Brown yelled to the [Petitioner] not to shoot, and that he thought he saw the [Petitioner] standing over the victim. He said that the two or three gunshots he heard from the porch, the last of which may have occurred after a slight pause, "had to come from [the Petitioner]." However, he acknowledged that he did not see the victim get shot, did not see the [Petitioner] with a gun, and did not see what transpired between the victim and the [Petitioner] before the shooting.

Rogers admitted that it was dark at the time of the shooting and that he had testified during the preliminary hearing that, although he had seen someone standing on the porch, he had not been able to see who it was. He acknowledged that he went to his mother's house after the shooting and that later he, "Premo," and "Tam" had gone armed with pistols to the West Memphis trailer home of the [Petitioner's] girlfriend, where they had kicked in the door and demanded to know the [Petitioner's] whereabouts. He also acknowledged that both he and the victim had both been involved with drugs at the time of the shooting.

Kenneth Ezell, who was 14 when the shooting occurred, testified that he was on the front porch of a duplex at 1185 Aubra Street at about 6:30 or 7:00 p.m. on November 24, 1996, when he saw the victim and Rogers pull up in a car. Ezell said that the next-door neighbor, Roger Lee, was on the porch with him at the time, as well as "Twin," whose real name, he believed, was Kevin Phillips. Rogers went next door, and the victim came up onto the porch of 1185 Aubra and began talking with Lee. Ezell said that the victim stood talking on the porch for about thirty minutes until they heard "a commotion" next door from the house he had seen Rogers enter, which caused everyone to turn around and look. When they did so, "there was a guy with two (2) guns saying drop it off." According to Ezell, the man was pointing his guns at the

-4-

entire group on the duplex's porch, and was not directing his words to any particular person. He said that when he saw the guns and heard the command to "drop it off," he ran into the house. Two or three seconds later, he heard three or four gunshots. After approximately twenty minutes, he went back outside and saw the victim lying on the porch. Ezell identified the [Petitioner] as the man he had seen with the two guns. He testified that he did not see the victim, "Twin," or Lee with a gun that evening, and that he had not had a gun either.

Ezell testified on cross-examination that he had seen the [Petitioner] around the neighborhood prior to November 24, 1996, but the first time he saw him on the day of the shooting was at about 7:30 p.m. He did not remember telling the police after the shooting that he was not on the porch when the [Petitioner] arrived, or telling an investigator in an August 26, 1999 telephone conversation that he did not come through the area until after everything had already happened. He also did not remember having said that he and Lee were the only ones on the porch that evening. He testified that he was on the porch immediately before the shooting, and that Lee, "Twin," and "Mug" were on the porch with him. The "Twin" on the porch with him was not Kevin Phillips, as he had suggested during his direct examination testimony, but instead was "another twin out of Hilltop, right down the street." However, Phillips had been "out there for a minute" before walking to a store. He did not recall any drug activity that night, denied any knowledge about any drug sales that might have been taking place on the street, and was not aware of what the victim and Rogers did for a living. He acknowledged that he heard someone yell, "They're fighting" just before he went into the house. He testified on redirect, however, that the [Petitioner] and the victim had not been fighting.

An eyewitness to the shooting, Kevin Phillips ("Twin"), testified that he had been in the area all day. The victim was talking to Robert Lee when Phillips left to go to the store. When he returned from the store, he saw Keith Brown chasing Eric Rogers around a car. At the same time, the [Petitioner] ran up, grabbed the victim, and slung him facedown onto his stomach with his hands out to his sides. The [Petitioner] told the victim to give him his money. The victim replied that he did not have any, and was "pulling his pockets out trying to show him he didn't have [any] money" when the [Petitioner] "all of a sudden" shot him. The victim said, "I ain't got no money, don't shoot me." The [Petitioner] shot him again. The victim said, "Please don't kill me." The

-5-

[Petitioner] then shot him again. During the shooting, Brown asked the [Petitioner] what he was doing and told him not to shoot or kill the victim.

Two days after the shooting, he identified the [Petitioner] from a photographic lineup as the victim's shooter. Phillips also made a positive courtroom identification of the [Petitioner] as the shooter. He testified that the [Petitioner] had two guns at the time of the shooting, and that he had also seen the weapons earlier that day when the [Petitioner] was "[f]lashing them around." As far as he knew, the victim did not have a weapon. On cross-examination, Phillips acknowledged that the victim and Rogers were both friends of his, and conceded that the [Petitioner] "probably" was "strung on crack cocaine" that night. He insisted, however, that he knew nothing about any drug activity on the street.

Officer Cham Payne of the Memphis Police Department Crime Response Unit testified that he and his partner received a call about the shooting at 6:45 p.m. When they arrived at the scene, 1185 and 1187 Aubra, which was a duplex, they found the victim lying on his back on the front porch in front of the door to 1185. Sergeant Thomas Helldorfer, a homicide investigator with the Memphis Police Department, testified that, as part of his investigation of the crime, he searched for the [Petitioner] at various locations, including the Aubra neighborhood and his grandmother's house on New York, but was unable to find him.

**Defense Proof**

The first defense witness was Steven Paul Rossby, Ph.D., a molecular neurobiologist on the faculty of Vanderbilt University School of Medicine, who was allowed to offer expert testimony on serotonin and its relationship to human behavior. Dr. Rossby testified that serotonin is one of a number of naturally occurring chemicals in the brain known as neurotransmitters, which fall into one of two categories: excitatory neurotransmitters, or chemicals that cause the nerve cells to fire impulses, and inhibitory neurotransmitters, or chemicals that inhibit or prevent the nerve cells from firing. Serotonin, which acts to inhibit the firing of nerve impulses, has been the subject of extensive research for over twenty years because it appears not only to be an inhibitory neurotransmitter, but also to control or orchestrate other inhibitory systems in the brain. Dr. Rossby explained that the various inhibitory systems in the human brain have evolved

so that we don't act on every impulse, so that we may get angry but we don't go beyond it, we control our anger, or we—we don't respond to everything that's happening impulsively, that we—we have a chance—we have some control within the limbic system. This has evolved over—I don't know how many millions of years these systems have evolved to protect us from just acting purely impulsively.

Dr. Rossby testified that the research in the field has consistently shown a link between low serotonin levels and "explosive impulsive violence." In addition, scientists have discovered that Type II alcoholism and intermittent explosive disorder are both linked to low levels of serotonin. He described a Type II alcoholic as "the mean drunk," "[t]he person who has a couple of drinks and, then, becomes suddenly violent and angry," and testified that intermittent explosive disorder is characterized by a "sudden loss of control and an explosive violent behavior that seems to have been triggered by little or nothing at all." He explained the relationship between low serotonin and violent behavior as follows:

Low serotonin, in itself, does not cause violence. Low serotonin only indicates your capacity for dealing with your anger, . . . your biological capacity to control yourself. But it doesn't actually—Serotonin does not produce violence. I mean, many people have low serotonin and they are depressed all of the time. And many people have low serotonin and they can't stop gambling. But it depends on a person's early childhood experiences and a lot of other factors. But with low serotonin, once the impulsive behavior has been—has been released, the low serotonin indicates your—your ability to take it back or control it. And many people who have low serotonin are virtually incapable of controlling their impulsive behavior.

Although he agreed that cocaine was a stimulant, he testified that scientific studies have not shown a link between serotonin levels and cocaine use. Therefore, he could not say whether chronic cocaine use by an individual with low serotonin would exacerbate the lack of inhibition.

Dr. Rossby testified that he determined the [Petitioner's] serotonin level was low by performing a statistical comparison of his average serotonin level to the average levels of thirty-four controls—men who were diagnosed by Vanderbilt psychiatrists to be "normal"; i .e., with no mental illnesses and no family history of mental illnesses. The [Petitioner's] average serotonin level

was 78.5 nanomoles. The thirty-four controls had average serotonin levels ranging from a low of 87.5 nanomoles to a high of 250 nanomoles, with the average or mean at 142.1 nanomoles. Using statistical tests and the data from the controls, he concluded that 89% of the males in the total population have higher serotonin levels than the [Petitioner]. The [Petitioner's] serotonin level, in fact, was "among the lowest" he had seen. Since the studies indicate that a man's serotonin level will remain stable throughout his life until he reaches the age of about 50 or 60, when serotonin levels tend to rise, he could assume that the [Petitioner's] serotonin level at the time he conducted his tests, in 1999, was reflective of his serotonin level at the time of the shooting, in 1996. Dr. Rossby testified that his opinion, "given the level of [the Petitioner's] serotonin and given the scientific literature and all of the studies," was that the [Petitioner's] "capacity to control [an] impulse once it has occurred is virtually non-existent."

On cross-examination, Dr. Rossby acknowledged that in order for serotonin to be related to a crime, the crime would have to be impulsive. He further acknowledged that the Finnish researchers who conducted the watershed study on the subject, a study to which he had referred numerous times during his testimony, had not included crimes in which the perpetrator had had a potential monetary motive, or had known his victim, in the group of crimes they considered impulsive. He said, however, that those criteria were merely used by the original researchers as "a convenience . . . to try to roughly separate the prisoners into two (2) groups so they could study the differences"; under the current scientific knowledge, a crime could be considered impulsive even if committed for potential monetary gain, or against someone known to the perpetrator.

The twenty-five-year-old [Petitioner] also testified in his own defense. He said that at the time of the incident he was making his living by selling drugs and gambling and had been engaging in those activities since he was 15. He often went to the Aubra Street neighborhood to sell "dope," and was there selling drugs at the time the shooting occurred. He was armed with a .22 pistol, which he always carried with him, due to the nature of his business and the neighborhood which he frequented. The [Petitioner] testified that it is common for people in the drug trade to be armed. He said that he knew both Rogers and the victim from the neighborhood, and knew that they were also involved in the drug trade. He testified that Rogers was the supplier of most, if not all, of the drugs sold in the neighborhood and that the victim was one of

his sellers. Although Rogers attempted to control all the drug activity in the area, the [Petitioner] did not work for him.

The [Petitioner] testified that he was smoking a marijuana cigarette and urinating against the side of the house when the victim and Rogers pulled up. He saw the victim get out of the car and then heard him arrange to sell a "dude" $100 worth of cocaine. When the victim ran upstairs to get the drugs, he stepped forward and "gave Dude a better deal." The victim came back down, learned from the drug buyer that the [Petitioner] had already sold him the drugs, became angry, and accused the [Petitioner] of stealing his sale. The [Petitioner] said that he answered by telling the victim, in effect, that he was just out there to make a living like everybody else. The victim responded by telling him that he should not be selling drugs in his area. The [Petitioner] said that he took offense and told the victim, "You have me f'd up." Next, the victim acted as if he were going to walk away, but then turned and reached for his gun.

The [Petitioner] testified that when he saw the victim reach for his gun, he grabbed the victim's hand and the two began "tussling." During the struggle, he picked the victim up and slung him down on the porch, causing the victim's gun to slide out of his hand. After he threw the victim down, he brought his gun out and shot him twice in rapid succession. When the victim began crawling toward his gun, he ran forward, grabbed the victim's gun, and shot him again. According to the [Petitioner], the entire episode occurred within the space of seconds or, in his words, "all at once." He could not clearly remember everything that had occurred, but knew that he ran to the corner after the victim fell. When asked if he had intended to rob the victim, the [Petitioner] answered, "No, sir. I had too much money in my pocket. I had over fifteen hundred (1,500)." He said that he threw the victim's gun, along with his own, into the river as he drove across the bridge into Arkansas.

The [Petitioner] further testified that he had been using large amounts of marijuana, cocaine, and alcohol, and was under the influence of both cocaine and alcohol at the time the shooting occurred. He said that he "smoke[d] weed like cigarettes," "dr[a]nk wine like water . . . all day every day," and snorted "[a]bout half an ounce a day" of cocaine. He began drinking and using drugs at the age of 4, when his uncles started giving him alcohol and marijuana to amuse themselves by watching him get high. Later, when they tried to get him to quit, it was too late. He said that he had lived in two treatment facilities as a child: MMHI, where he lived when he was 9 or 10, and

Sequoia Center, where he lived for about two years. At both facilities, he was prescribed "a lot of drugs," whose names he could not remember. He first heard the term "intermittent explosive disorder" when he was about 5 or 6 and was put into treatment. Although he did not understand what the term meant, he remembered that he used to lose his temper almost every day, and that he would get so upset that he would "blank out." When he came to, he could not always remember what he had done while he was "blanked out."

On cross-examination, the [Petitioner] denied having had two guns when he went to Hughlett's house, or having been with Brown at the Aubra Street location. He admitted that he had accepted a ride from Brown after the shooting, but said that he had not known anything about Brown's robbery of Rogers at the time. He testified that he had been around the corner using a pay phone when Brown pulled up and offered him the ride. He said that he had "snapped" when the victim pulled the gun on him, but acknowledged that he did not say anything in his statement to the police, when they located him several months later, about the victim's having pulled a gun. He explained this omission by testifying that he had told the police only what he "felt that they needed to know," that he had killed the victim but had not robbed him. He admitted that his memory of the events surrounding the shooting was not perfect, and that some of what he remembered might have occurred in his dreams. On redirect, he testified that he had told the same story he was telling in court to his defense counsel and their investigators "[m]any, many times."

Id. at *1-7 (footnotes omitted).

On direct appeal of these convictions to this Court, the Petitioner argued that (1) the trial court erred by overruling his motion in limine; (2) the evidence was insufficient to support his convictions; and (3) the trial court committed sentencing errors. Id. at *1. After reviewing the record and applicable authorities, this Court affirmed the convictions and the Petitioner's sentences. Id. at *1, 18. Our supreme court denied the Petitioner's request for permission to appeal on May 19, 2003.

The Petitioner filed a petition for post-conviction relief on May 12, 2004. Counsel was appointed for the Petitioner, and an amended petition was filed. The Petitioner asserted that he did not receive the effective assistance of counsel at trial or on direct appeal. As specific grounds for relief, the Petitioner made the following allegations: (1) trial counsel was ineffective for failing to include as an issue in the motion for new trial whether the trial court erred by not charging reckless homicide as a lesser included offense of premeditated

murder and felony murder, and appellate counsel was ineffective for failing to raise this issue on appeal; (2) trial counsel was ineffective for failing to request an instruction on voluntary manslaughter as a lesser included offense of felony murder and failing to present this issue in the motion for new trial, and appellate counsel committed error by failing to raise this issue on appeal; (3) trial counsel was ineffective for failing to fulfill promises made to the jury during his opening statement; (4) trial counsel was ineffective for failing to challenge the improper definition of "knowingly" for second degree murder and in failing to raise the issue in the motion for new trial, and appellate counsel was ineffective for failing to raise this issue as plain error on appeal; (5) trial counsel was ineffective for failing to present evidence of the victim's past conduct to show that the victim was the first aggressor; (6) trial counsel was ineffective for failing to request an instruction on voluntary intoxication or object to its absence in the jury charge and, further, for failing to present the issue in the motion for new trial; and (7) trial counsel was ineffective for failing to object to the State's improper closing argument. In a second amended petition, the Petitioner argued that his sentence—its length enhancement and consecutive nature—was unconstitutional under Blakley v. Washington, 542 U.S. 296 (2004).

A hearing was held on November 10, 2008, at which counsel (the Petitioner's lead counsel at trial was the same lawyer who represented him on direct appeal) and co-counsel testified (collectively referred to as counsel). After hearing the evidence presented, the post-conviction court denied relief. This appeal followed.

**Analysis**

On appeal, the Petitioner argues that counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial and on direct appeal.[1] To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

---

[1] For the purposes of clarity, we have renumbered and reordered the issues as stated by the Petitioner in his brief.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

The principles are the same when determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively deficient in failing to raise a particular issue on appeal, and (2) absent appellate counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. See, e.g., Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994).

It is counsel's responsibility to determine the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App.1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell, 904 S.W.2d at 597. The determination of which issues to raise is a tactical or strategic choice. Id.

## I. Reckless Homicide Instruction

As his first assignment of error, the Petitioner submits that counsel rendered ineffective assistance when he did not raise the issue of whether reckless homicide should have been charged as a lesser included offense of both first degree and felony murder in the motion for new trial or on direct appeal. Reckless homicide is a reckless killing of another and is a Class D felony. See Tenn. Code Ann. § 39-13-215. "Reckless" refers

> to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).

Here, the trial judge instructed the jury on second degree murder and voluntary manslaughter as lesser included offenses on the premeditated murder count; he only instructed second degree murder as a lesser included offense on the felony murder count. Counsel did request a reckless homicide instruction on the premeditated count, but the request was denied. The trial court ruled that the facts did not support a reckless homicide charge. On September 18, 2000, the jury returned verdicts of second degree murder on both counts.

Testimony at trial established that the Petitioner had been using cocaine at the time of the shooting and that, coupled with the proof regarding his low serotonin levels, it was possible that the jury could have concluded the killing was reckless. Reckless homicide simply contains a different mental state indicating a lesser kind of culpability than premeditated murder. Accordingly, the trial court was obliged to instruct the jury as to the lesser included offense of reckless homicide when the evidence showed a basis for the jury concluding that the killing was reckless.

Although the trial court erred in failing to instruct the jury on reckless homicide, the issue presented by the Petitioner is whether counsel was ineffective in failing to pursue this issue in the motion for new trial and on appeal. We cannot conclude that the Petitioner has established prejudice. The Petitioner was obliged to prove by clear and convincing evidence a reasonable probability that the outcome of the trial proceeding would have been different had the instruction been given. See Stickland, 466 U.S. at 694. A court reviewing a claim of ineffective assistance of counsel may not order a new trial unless the court concludes there is a reasonable probability that the error did affect the verdict. See id.; see also Overton, 874 S.W.2d 6, 11 (Tenn. 1994) ("To establish actual prejudice, the defendant must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"), cf. State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002) (articulating a traditional test for harmless constitutional error in omitting jury instruction on lesser included offense and indicating that the conviction will be reversed on direct appeal unless the reviewing court is convinced beyond a reasonable doubt that the error did not affect the verdict).

The proof at trial demonstrated that the Petitioner had a motive to shoot the victim (drug sales), he procured a weapon, and he shot the victim three times, the third shot coming after a pause. In the face of this evidence, we are unconvinced in this collateral attack proceeding that the verdict would have been different had counsel persuaded the trial judge to charge reckless homicide as a lesser included offense of first degree murder. Furthermore, the Petitioner would not have been able to establish plain error on appeal. The Petitioner never argued that the shooting was accidental and evidence of provocation existed in the record. See State v. Jerry W. Jordan, No. M1999-00813-CCA-R3-CD, 2001 WL 1218314, at * 9 (Tenn. Crim. App., Nashville, Oct. 11, 2001) ("In a case where no evidence of provocation exists, the logical immediate lesser included offense of second degree murder is reckless homicide because what distinguishes voluntary manslaughter from an intentional or knowing killing is not a lesser mental state, but rather, the extenuating circumstance of adequate provocation."). The trial court did instruct the jury on voluntary manslaughter as a lesser included offense of premeditated murder; the jury convicted the Petitioner of second degree murder and rejected the lesser included offense of voluntary manslaughter. See State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998) (failure to instruct on voluntary

manslaughter as a lesser included offense was harmless error where jury convicted on first degree murder and declined to convict on second degree murder); see also State v. Nelson Troglin, No. E2001-00251-CCA-R3-CD, 2002 WL 385800, at *19-20 (Tenn. Crim. App., Knoxville, Mar. 12, 2002); State v. Marcus W. Keener, No. M2000-0017-CCA-R3-CD, 2001 WL 428232, at *6-9 (Tenn. Crim. App., Knoxville, Apr. 26, 2001).

Additionally, reckless homicide was not recognized as a lesser included offense of felony murder at the time the Petitioner's case was tried. See State v. Ely, 48 s.W.3d 710, 718-22 (Tenn. 2001). We conclude that the standard for counsel's performance was met when counsel acceded to the existing law. See State v. Benny Wallace, No. 86-208-III, 1987 WL 16073, at *4 (Tenn. Crim. App., Nashville, Aug. 26, 1987) ("[A]ttorneys may not be said to be ineffective for not anticipating rulings that change or alter existing law."); see also John Robert Tory, Jr. v. State, No. E2003-00019-CCA-R3-PC, 2003 WL 23021389, at *2 (Tenn. Crim. App., Knoxville, Dec. 29, 2003). Although Ely was decided after the Petitioner's trial, the decision predated our opinion on the Petitioner's direct appeal and, therefore, the lesser included issue, if it had been properly raised in the trial court, could have been available for appellate review. Nonetheless, the Petitioner has failed to carry his burden of proof to show any ineffectiveness on the part of his appellate counsel, as we see no reasonable probability that the outcome of the direct appeal would have been any different. The Petitioner is not entitled to relief on this issue.

## II. Voluntary Manslaughter Instruction

The Petitioner contends that counsel was ineffective by not requesting an instruction on voluntary manslaughter as a lesser included offense of felony murder at trial and that counsel should have raised this issue on appeal. Voluntary manslaughter was not recognized as a lesser included offense of felony murder at the time the Petitioner's case was tried. See State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *14 (Tenn. Crim. App., Aug. 2, 2001) (holding that voluntary manslaughter is also a lesser included offense under part (b)(1) of Burns). Again, we conclude that the standard for trial counsel's performance was met when counsel acceded to the existing law. See Wallace, 1987 WL 16073, at *4; see also Tory, 2003 WL 23021389, at *2. Additionally, in this collateral attack proceeding, the Petitioner cannot establish prejudice due to the fact that voluntary manslaughter was charged on the premeditated count and was rejected by the jury. See Wilson, 2001 WL 872442 at *11, 15. The Petitioner has failed to establish he is entitled to post-conviction relief.

## III. Opening Statement

There are two major cases in Tennessee dealing with the failure of counsel to fulfill the promises made to the jury during voir dire or opening statement. In State v. Zimmerman, 823 S.W.2d 220, 221 (Tenn. Crim. App. 1991), the defendant was charged with second

degree murder. During opening statement, counsel stated, in accordance with trial strategy, that the defendant and a psychologist would testify regarding the defense of "battered wife syndrome." However, at the conclusion of the State's proof, counsel recommended to the defendant that she not testify. Id. at 222. Additionally, counsel rested without presenting the testimony of an expert regarding battered wife syndrome or any additional proof. Id. This Court concluded that counsel was ineffective, stating that "nothing changed during the course of the trial . . . . In other words, there appears to have been no basis for the sudden change in strategy." Id. at 226.

In King v. State, 989 S.W.2d 319, 330 (Tenn. 1999), the defendant, who was convicted of felony murder, complained that his counsel "abandoned the defense theory of voluntary intoxication after having introduced it to the jury during the opening statement." During King's trial, his ex-girlfriend, Lori Eastman Carter,

> testified for the prosecution, over the objection of defense counsel, that [King] had attempted to kill her on October 13, 1982. According to Ms. Carter, the appellant hit her with a slapstick numerous times while repeatedly asking her "how it felt to be dying, so that the next woman he killed he would know how she felt." Ms. Carter testified that the appellant was sober when he attacked her with the slapstick.

Id. at 331.

At the post-conviction hearing, defense counsel asserted that "he decided to abandon the use of voluntary intoxication to defend [the defendant's] actions after the testimony of [the defendant's] ex-girlfriend, Lori Eastman Carter . . . [because] Ms. Carter's testimony was unexpected and devastating to the appellant's case." Id. Counsel asserted that "the theory of voluntary intoxication was rendered futile after Ms. Carter's testimony." Accordingly, counsel "revised the defense theory solely in response to the surprise testimony of Ms. Carter." Id. Our supreme court determined that counsel's change of strategy during trial did not constitute ineffective assistance. Id.

In the instant case, the Petitioner argues that counsel was ineffective in telling the jury during opening statement that two additional expert witnesses would be called to testify regarding the Petitioner's mental state and, moreover, "that the jury never heard about a majority of the things promised to them in opening statement by trial counsel." The post-conviction court observed in its order denying relief that "[t]his appears to be a matter of trial strategy." According to the testimony of counsel at the post-conviction hearing, following the conclusion of the Petitioner's testimony, counsel believed that the defense should "stop on a high note." Counsel relayed that the Petitioner testified better than

expected and that they made a "strategic call" not to call the remaining two experts. They did not believe the experts "would have been as good a witness in front of the jury as [the Petitioner] was." Moreover, the jury had already heard one expert testify regarding the Petitioner's low serotonin levels; the Petitioner acknowledged in his brief that his own testimony at trial provided some of the details promised during opening statement and that those details were expected to be provided by the expert witnesses. The decision to deviate from the strategy announced in the opening statement was a sound decision, and also a successful one, resulting in a conviction for second degree, rather than first degree, murder. Counsel did not render ineffective assistance.

## IV. "Knowing" Definition

Next, the Petitioner claims that the trial court erred in presenting to the jury definitions of culpable mental states contrary to State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002). In Page, this Court reversed a conviction of second degree murder, a result-of-conduct crime, because the trial court instructed the jury that a person acts knowingly if the person acts with merely an awareness that his conduct is of a particular nature or that particular circumstances exist rather than instructing that the person acts knowingly, for purposes of a result-of-conduct crime, only when the person is aware that the conduct is reasonably certain to cause the result. Id. at 788. The trial court in the Petitioner's case utilized the same instruction as that condemned in Page. Page was filed while the Petitioner's case was pending on appeal.

Nonetheless, we defer to State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005). The Faulkner court, in performing a plain error analysis, said, "We are not convinced, however, that the inclusion of . . . language [inapt per Page] is an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition." 154 S.W.3d at 58-59. More pointedly, the Faulkner court said, "The superfluous language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly." Id. at 59. We agree with the post-conviction court that the Petitioner has failed to show he is entitled to relief on this issue.

## V. Victim's Past Conduct

In another issue, the Petitioner asserts that counsel was ineffective for not introducing proof of the victim's prior violent acts in order to corroborate proof that the victim was the first aggressor. In the evidentiary hearing, however, the Petitioner offered only a "Record of Arrest" which showed that the victim was arrested for unlawful possession of a weapon on June 21, 1996, and an affidavit of complaint showing facts leading to a misdemeanor conviction for harassment. Counsel testified that he knew of these convictions prior to trial and was also aware of an additional arrest for assault and vandalism (no conviction resulted).

The Petitioner did not present witnesses at the evidentiary hearing in support of the claim of a violent reputation or of prior violent acts. The failure to present such proof defeats the Petitioner's claim. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner has not shown that trial counsel was deficient in failing to develop or present first aggressor evidence. Furthermore, the Petitioner has not shown that there was a reasonable probability that the result of the proceedings would have been any different had such evidence been offered. This issue is without merit.

## VI. Voluntary Intoxication Instruction

The Petitioner contends that counsel's failure to request the instruction on voluntary intoxication constituted deficient representation and was not an informed trial strategy. Tennessee Code Annotated section 39-11-503(a) provides that while intoxication is not in itself a defense to prosecution, a defendant's intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state. We agree with Petitioner that he is entitled to a jury instruction on voluntary intoxication if it is fairly raised by the proof, but "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979).

Counsel testified at the post-conviction hearing that an instruction on voluntary intoxication would have been contrary to his trial strategy, that the Petitioner's low serotonin levels caused him to shoot the victim. It is unclear to us why counsel believed that an instruction on voluntary intoxication would have defeated the defense theory. Diminished capacity was charged to the jury. Nonetheless, counsel was required to choose his strategy, and we are not at liberty to second-guess trial strategy that is made with appropriate planning and preparation. Adkins, 911 S.W.2d at 347; see also James Rines v. State, No. 03C01-9606-CC-00210, 1997 WL 33654, at *4 (Tenn. Crim. App., Knoxville, Jan. 28, 1997) (concluding that trial counsel was not deficient for failing to develop defense of intoxication when she explained that defenses of intoxication and self-defense were incompatible in the case). Further, the Petitioner has failed to show that he was prejudiced as a result of counsels' decisions; we are unpersuaded that there is a reasonable likelihood that the jurors would have reached different verdicts had the instruction on voluntary intoxication been given. This issue is without merit.

## VII. Closing Argument

The Petitioner asserts that he received the ineffective assistance of counsel because his counsel did not object to improper statements in the State's closing argument. No objection was made when the prosecutor gave her personal opinion and compared this case to other cases she had handled, stating, "And what you can do, and it's truly—I've never seen that many cases come together like this—it's truly like a puzzle." The Petitioner also submits

-18-

that another statement pertaining to a prior robbery by the Petitioner "misled the jury as to the inferences it may draw." The robbery was only relevant for impeachment purposes, and the State referenced it during its argument on the general issue of the Petitioner's guilt.

This Court has considered whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel. See Gregory Paul Lance v. State, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619 (Tenn. Crim. App., Nashville, Aug. 16, 2006). In Lance, this Court held as follows:

> Because the reviewing court must indulge a strong presumption that the conduct falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed by inadequate preparation, it is highly unlikely that appellate counsel could have succeeded in meeting either the deficiency or the prejudice prong of the ineffective assistance of counsel claim based on trial counsel's failure to object to the improper closing argument.

Id. at *6 (citations omitted); see Strickland, 466 U.S. at 690; Hellard, 629 S.W.2d at 9.

This Court approaches the present case under the same legal framework. The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions. As the Lance court noted, attorneys may often choose not to object to damaging evidence for strategic reasons, such as "to avoid emphasizing [the unfavorable evidence] to the jury." Lance, 2006 WL 2380619, at *6. Counsel testified that, while the statements were technically improper, he did not believe that they were egregious enough to result in prejudice to the Petitioner's case. Counsel testified that he generally does not object during the State's closing arguments unless he determines the statements are actually prejudicial to his client. He said his belief is that the State in turn affords him some leeway. We conclude that the failure to object to the closing argument in this case does not rise to the level of constitutionally deficient performance. Additionally, we agree with the post-conviction court that any error in this regard would be deemed harmless; thus, the Petitioner has failed to establish prejudice.

## VIII. Blakely v. Washington

Finally, the Petitioner argues that counsel was ineffective in failing to raise sentencing issues pursuant to Blakely v. Washington, 542 U.S. 296 (2006). He urges us to apply Blakely and its progeny retroactively to his case.

To the extent that the Petitioner is attempting to gain relief from his sentence via retroactive application of the Blakely decision, this Court has repeatedly held that Blakely

did not announce a new rule of law entitled to retroactive application in a post-conviction proceeding. See e.g., Glen Cook v. State, No. W2006-01514-CCA-R3-PC, 2008 WL 821532, at *10 (Tenn. Crim. App., Jackson, Mar. 27, 2008), perm. to appeal denied, (Tenn. Sept. 29, 2008); Carl Johnson v. State, No. W2003-02760-CCA-R3-PC, 2005 WL 181699, at *4 (Tenn. Crim. App., Jackson, Jan. 25, 2005); Donald Branch v. State, No. W2003-03042-CCA-R3-PC, 2004 WL 2996894, at *9-10 (Tenn. Crim. App., Jackson, Dec. 21, 2004). We see no reason to deviate from this jurisprudence today. Therefore, the Petitioner has not alleged a cognizable basis for post-conviction relief, and he is not entitled to relief on this issue.

**Conclusion**

Based upon the foregoing reasoning and authorities, we conclude that the Petitioner has not shown he is entitled to relief on grounds of ineffective assistance of counsel. The judgment of the Shelby County Criminal Court denying post-conviction relief is affirmed.


_____
DAVID H. WELLES, JUDGE