IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 26, 2016

## TERRELL LOVERSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 1003485     James C. Beasley, Jr., Judge**
_____

**No. W2015-01381-CCA-R3-PC  -  Filed January 30, 2017**
_____

The petitioner, Terrell Loverson, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred by concluding that appellate counsel rendered effective assistance. According to the petitioner, appellate counsel should have raised, as an issue on appeal, the trial court's denial of his request for a self-defense jury instruction. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua B. Dougan, Jackson, Tennessee, for the appellant, Terrell Loverson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

This post-conviction appeal arises from a February 2010 altercation between the petitioner and a security guard at the Southland Mall in Shelby County, Tennessee that resulted in the security guard's death. The petitioner was indicted for one count of first degree premeditated murder, one count of assault by bodily injury, and one count of resisting arrest. After a jury trial, the petitioner was convicted of second degree murder, assault by provocative contact, and resisting arrest. The trial court sentenced the petitioner as a Range I, standard offender, and imposed an effective sentence of twenty-

five years. The petitioner appealed, and in its opinion affirming the petitioner's convictions, this Court offered the following summary of the facts presented at trial:

Earl Jones, the security director for Southland Mall ("The Mall"), testified that he had twelve security guards working under him in February 2010, including the victim, Marques Rainey. The victim had been working at the Mall since May 2007. Jones described him as "a good employee, quiet, reliable . . . He was a huge man but he was very quiet and he was educated." As part of their job, the security guards, including the victim, wore uniforms consisting of a gray long-sleeve shirt with "security" designated on each shoulder and black slacks. The guards did not carry weapons but did each carry a radio.

On Saturday, February 27, 2010, the victim reported for duty, in uniform, at 2:00 in the afternoon. Jones described the Mall as "very busy" at that time. Shortly after 2:00, another security guard called in an emergency at the north entrance of the Mall. Jones stated that all of the guards were responding to that location and that, shortly thereafter, "they just called officer down." By the time Jones arrived a crowd had gathered. Jones found the victim "lying on the floor with a gunshot wound to his upper right chest." Jones stayed with the victim until the ambulance took him away.

Chantrice Rainey, the victim's wife, testified that they married in 2007. She identified a photograph of the victim on their wedding day.

Jerren Rutherford testified, identifying the [petitioner] at trial as his friend. On February 27, 2010, Rutherford and the [petitioner] went to the Mall to go shopping. They went in Rutherford's car and, after entering the Mall, "went their separate ways." Rutherford went to a shoe store and bought some shoes for his daughter. After he left the store, he saw the [petitioner] running toward one of the Mall exits. According to Rutherford, "[a]ll [of] a sudden the security grabbed [the petitioner] and pinned him up against the wall and was holding him." Rutherford told the security guard, "[L]et my N[*****] go." At that point, Rutherford testified, the guard "let him go, like he barely let him go. He released because he thought I was going to hit him or something. I don't know. It was like he was scared, I don't know." After the guard let the [petitioner] go, Rutherford saw "a gun go off." Rutherford explained that, four or five seconds after the guard let the [petitioner] go, the [petitioner] shot the guard. Rutherford stated that the shooting "was real quick" and that he "didn't have time to say [sic] stop

- 2 -

or nothing.  It was just so fast.  It was like you couldn't like even try to stop it from happening."  The [petitioner] fired one shot.  Rutherford stated that, afterward, he stood there "in shock" and then he "ran to the car."  The [petitioner] went with him, and they drove away together.

Rutherford testified that he had not known that the [petitioner] was armed.  The [petitioner] still had the gun with him when the two men got in Rutherford's car.  Rutherford stated that the gun was black but that he did not know what kind of gun it was other than an "automatic."  After they had driven several minutes, Rutherford dropped the [petitioner] off near "Ballenshire" in Memphis.  The [petitioner] took his gun with him.  Rutherford then went home.  He did not call the police.

Rutherford later gave a statement to the police and identified a photograph of the [petitioner] in a photograph array.  On the array, Rutherford wrote, "This is Terrell[,] this [is] who shot the security guard."  Rutherford later learned that the incident had been videotaped by the Mall's security camera.  He reviewed the video and acknowledged that it depicted what he saw.  The video was admitted into evidence and played for the jury.

On cross-examination, Rutherford agreed that the security guard had thrown the [petitioner] "around like a rag doll."  Rutherford wanted to stop the "man-handling" and told the guard to let the [petitioner] go.  Rutherford testified that, after the guard let the [petitioner] go, and as the [petitioner] was backing up, the guard was "going after him again."  At that point, the [petitioner] pulled a gun and shot the guard.  According to Rutherford, the [petitioner] looked "like he had fear in his eyes."

Emory Hammonds testified that he worked in "the Barbershop" in the Mall, located across the aisle from Sweetness Sweets.  Hammonds was at work on the 27th and, at about 2:30 that afternoon, he "heard like kind of a rumbling, a lot of people running, a little commotion and you could tell it was coming from a little distant."  He saw several "guys" running and "saw one guy hit a guy while they was running."  Hammonds described the commotion as looking "like a gang fight."  Then he saw the victim "grab one guy by the arm and they kind of spun around."  Hammonds heard a "pow" and saw the victim rolling on the floor.

On cross-examination, Hammonds explained that the man that the victim grabbed was headed out of the Mall.

James Allen testified that he worked at the Barbershop in the Mall and that Hammonds was his boss. At about 2:30 in the afternoon of the 27th, he was at work and saw several "guys" running out of the Mall. He then saw "another group of guys," one of whom got into a "scuffle" with the victim. He saw the two men separate and then he "seen a gun raised up and pop pop and he got on out the mall."

Allen subsequently identified two men from photograph arrays, labeling one as "the guy who shot the man in the mall" and the other man as "with the shooter in the mall." Allen also identified the [petitioner] at trial as the shooter.

Oscar Quinn testified that he was working at the Barbershop when the victim was shot. He described what happened:
> "I just heard a lot of commotion going on at the entrance of the mall, and I stopped cutting hair and just walked up to the front entrance up to the door to see what was going on. And I just witnessed that some guys was fighting and security guard, you know, jumped between, you know, two suspects and decide to push one guy back and he retained one suspect and pinned him against the [wind] machine. Once he released him and I turned my head for a brief second, turned back and just witnessed a shot."

Quinn reiterated that the shooter fired the shot after he had been released by the victim. The shooter then ran out of the Mall. Quinn followed and saw him get in a car. A customer also went outside, got the tag number from a Maxima, and gave the number to Quinn. Quinn later turned the number over to the Memphis Police Department.

On cross-examination, Quinn again stated that the security guard got between two men and "pushed one suspect back and he grabbed the other guy back and held him for a second or two once he released him." The shooter was the person that the security guard grabbed and pushed against the wind machine, pinning him. After the guard released the shooter, the shot followed very quickly.

Tywaun Bonds identified the [petitioner] as someone he knew by the name of "T-Bo." He also stated that he knew the [petitioner] to "hang out" with another individual he knew as "South Memphis." On the 27th, Bonds

was in the Mall shopping. He "saw a group of folks standing in the middle of the mall and they got to fighting." He then saw "a lot of folks breaking out and running." The [petitioner] was one of the group of people fighting. When they ran toward the front entrance of the Mall, Bonds saw the security guard grab the [petitioner]. South Memphis ran up and said, "Let my N[*****] go, bitch." The security guard let the [petitioner] go. Bonds then heard a shot but did not see who fired it.

Bonds subsequently identified photographs of the [petitioner] and the man he knew as South Memphis from photograph arrays.

Justin Jenkins, eighteen years old at the time of trial, testified that he had been in the Mall at the time of the shooting. He was there with one of his "partners," Tywaun Bonds. While they were there, a "fight broke out." He said that two of the fighters were "South Memphis" and "T-Bo." He testified that "[e]verybody started running towards the front [of the Mall] and the security had grabbed T-Bo. And South Memphis told the man get up off him and after that everybody ran out of the mall after a shot was fired." Jenkins did not see who fired the shot. He later identified South Memphis and T-Bo from photograph arrays.

After a jury-out hearing, the State introduced the preliminary hearing testimony of Ellen Thomas, determined by the trial court to be unavailable to testify at trial. On February 27, 2010, Thomas was working at the Sweetness Sweets shop in the Mall. Her shop was across the aisle from the Barbershop. The "wind machine" was in the aisle of the Mall between the two shops. The machine was booth-like, designed for someone to stand in while it blew wind at 78 miles per hour.

On the day in question, she heard a "commotion" and told one of the other employees to pull down the "gate" across the front of the shop. As the other employee went to pull the gate down, Thomas said "that's when [the victim] and the boy was wrestling, you know, and they had made it up there tumbling, you know, struggling with each other." By this time, "quite a few" people had already run past the shop to the door of the Mall.

Thomas stated that she was no more than ten feet away from the victim and the man with whom he was struggling. She explained what she saw:

> "[The victim] and the guy was tussling and they made it up at
> the 78 wind machine. So [the victim] had subdued him up

against the machine after they got through, you know, tussling with each other. [The victim] had him subdued up against this machine and then this other guy came up. And I'm going to assume that was his friend and he said he was talking to [the victim], he said oh punk ass n[*****], let my partner go. And then [the victim] hesitated for a minute, you know, before he let him go and then he hesitated. He let him go and the other guy who he had subdued up to that machine, you know, stepped back and he, you know, like, jumped back him and his partner.

So his partner was on the right side of him and he was on the left side and they stepped back. And when he stepped back, [the victim] stepped to the side to get, you know—he was looking out the front door. He stepped right in front of our store. And when he stepped in front of our store, probably about five seconds later or something, the guy pulled the gun out and just shot him right there in the middle of the chest."

Thomas clarified that the person who pulled the gun was the person whom the victim had subdued. Thomas stated that one shot was fired and that the shooter ran out the front entrance of the Mall. Thomas added that, when the shooter pulled his gun and shot, the victim "was just standing there." Thomas was subsequently able to identify the shooter's partner, but not the shooter.

On cross-examination, Thomas described the victim as about six feet, one or two inches tall and "big." She stated that she did not know what happened between the victim and the shooter prior to her seeing them struggling in front of her store. She did not see any other security guards at that time. She clarified that it was the victim who stepped back after letting the shooter go. She added that, after the victim let the shooter go, the shooter "bounced back with his partner" no more than ten feet.

Officer Christopher L. Gibson of the Memphis Police Department ("MPD") responded to the scene. He found the victim and attempted first aid. After medical personnel arrived, he secured the scene. Witnesses also were sequestered.

Officer Jeffrey Garey of the MPD Crime Scene Investigation Unit reported to the scene and took multiple photographs. He also composed a

sketch of the Mall, indicating where certain items were found. He collected a spent bullet as well as several other items.

Officer Mark Jordan of the MPD testified that he received information that the [petitioner] was located at a house on Snyder in Shelby County. On March 1, 2010, he and several other officers went to the location to apprehend the [petitioner]. They surrounded the house, and one of the officers knocked. A woman answered the door and allowed the officers inside. They found the [petitioner] hiding in the attic. As they tried to apprehend the [petitioner], the [petitioner] resisted and fought. As other officers moved the [petitioner] closer to Officer Jordan, the [petitioner] "balled up his right fist and punched [Officer Jordan] in the face." The [petitioner] subsequently kicked Officer Jordan before Officer Jordan was able to handcuff him.

On cross-examination, Officer Jordan stated that no photographs of his face were taken after the [petitioner] hit him and that he did not go to the hospital.

Sergeant Brad Webb of the MPD was provided with the license tag number that had been recovered at the scene and traced it to Jerren Rutherford. After the [petitioner] was taken into custody, Sgt. Webb and Sergeant Peel spoke with him. They advised the [petitioner] of his rights. The [petitioner] waived them, agreeing to give a statement. The [petitioner] told the officers that he had been at the Mall on the day in question and that a fight had broken out between members of his gang, the Goon Squad, and members of a rival gang, the Fam Mob. He stated that, as he was trying to get out of the Mall, another fight broke out and he heard a shot fired. He ran out of the Mall, got in a white Toyota, left.

The officers advised the [petitioner] that they did not believe he was telling the truth and reminded him that the Mall had numerous video cameras.

In addition to interviewing the [petitioner], Sgt. Webb took photographs of the [petitioner's] arms, showing his tattoos. These photographs were admitted into evidence. Sgt. Webb explained that the tattoos included the words "Goon" and "Goon Squad Mafia," consistent with the [petitioner's] admission that he belonged to the Goon Squad gang.

Lieutenant Mark Miller of the MPD testified that he spoke with the [petitioner] after Sgts. Webb and Peel did. The [petitioner] asked Lt. Miller what he was being charged with, and Lt. Miller responded that "the charge on the arrest ticket was first degree murder." The [petitioner] then started talking about what had happened and the Mall, and Lt. Miller obtained a formal statement. The [petitioner's] written statement was admitted into evidence. In his written statement, the [petitioner] admitted responsibility for the victim's death; admitted that he went by "T-Bo"; stated that, while he and Jerren were at the Mall, "somebody swung, something about Fam Mob. I'm Goon Squad"; and explained the events as follows: "We was already running before the security guard came. A fight was in the front of the mall. Somebody just came and grabbed me from behind. I didn't know who it was. Then the gun went off and I left." The [petitioner] stated that the security guard grabbed him "[f]rm the neck from behind like in a choke hold. He ain't say nothing." At that point, the [petitioner's] gun was "[o]n [his] waist about to fall." The [petitioner] stated that he was carrying the gun, a 9 millimeter, because "this man told [him] somebody was gonna kill [him]." He added that the gun was currently "[i]n the woods somewhere." The [petitioner] described the distance from which he shot the victim as approximately four feet. He stated that he fired one shot. He also stated that he arrived at and left the Mall alone. He denied having heard Jerren say anything to the security guard.

Cervinia Braswell of the Tennessee Bureau of Investigation testified that she was "a special agent assigned as a forensic scientist to the Firearms Identification Unit." She examined the bullet recovered from the crime scene and determined it was "a 9 millimeter caliber total metal jacket bullet."

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified that he performed an autopsy on the victim. The victim was six feet, two inches tall and weighed 258 pounds. The victim had a gunshot wound to the chest. The bullet entered the victim's right upper chest and exited out the victim's back. In conjunction with performing the autopsy, several photographs of the victim were taken and admitted into evidence. Dr. Ross testified that the cause of death was "a gunshot wound to the chest." The manner of death was homicide.

The State rested its case after Dr. Ross' testimony. The defense put on no proof. The jury found the [petitioner] guilty of second degree murder (charged as a lesser-included offense of first degree premeditated murder),

assault by provocative contact (charged as a lesser included offense of assault by bodily injury), and obstructing arrest.

*State v. Terrell Loverson*, No. W2011-02055-CCA-R3, 2012 WL 5509776, at *1-6 (Tenn. Crim. App. Nov. 14, 2012), *perm. app. denied* (Tenn., Mar. 5, 2013).

On September 4, 2013, the petitioner filed a *pro se* petition for post-conviction relief. The post-conviction court appointed counsel to represent the petitioner in his post-conviction claim. The petitioner then filed an amended petition for post-conviction relief arguing solely that appellate counsel was ineffective for failing to challenge the trial court's denial of the requested self-defense instruction. On June 30 and July 14, 2015, the post-conviction court heard the petitioner's claim.

Appellate counsel testified at the post-conviction proceeding that he was appointed to represent the petitioner on appeal. At the time of the hearing, he had been a criminal defense lawyer for eighteen years. Based on his review of the record, appellate counsel agreed that trial counsel requested a jury instruction on self-defense, and the trial court denied the request. Trial counsel then raised the jury instruction issue in the petitioner's motion for a new trial, which the trial court also denied. After taking the totality of the circumstances into consideration, appellate counsel subsequently elected not to raise the issue on appeal.

When explaining why he decided not to raise the jury instruction issue on appeal, appellate counsel stated that after reviewing the record, it was his belief that the petitioner was not afraid of the unarmed security guard. Appellate counsel noted that the petitioner:

> was part of a violent street gang; that [the petitioner] had previously assaulted an unarmed security guard. And the security guard in this case was unarmed. I did not think, I still do not think, that self-defense would be warranted. I don't think you can shoot an unarmed man and claim self-defense.

Appellate counsel acknowledged there was testimony at trial that the petitioner had "fear in his eyes" when he was struggling with the security guard. There was also testimony, however, that the security guard "had fear in his eyes." Appellate counsel believed the trial court denied the petitioner's request for the self-defense instruction because the petitioner was in possession of a weapon and committing unlawful activity at the time of the altercation. In his opinion, the issue of self-defense simply had not been fairly raised by the proof. Appellate counsel "didn't think [the instruction] was warranted, and that was [his] reason for not raising it on appeal."

- 9 -

The post-conviction court denied the petitioner's claim for post-conviction relief in a written order on July 20, 2015. The post-conviction court found that the issue of self-defense was not raised by the proof at trial, so appellate counsel was not ineffective for choosing not to raise the issue. The petitioner timely appealed.

## II. ANALYSIS

The petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. *Strickland v. Washington*, 466 U.S. 668, 690-94 (1984). The issue of whether a defendant received effective assistance of counsel is a mixed question of law and fact. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). We review this issue de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.* This Court will not reweigh evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997).

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter*, 126 S.W.3d at 886. To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

Under the two-prong *Strickland* test, the petitioner must first show that counsel's errors were so egregious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. *Strickland,* 466 U.S. at 687. Second, the petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, one whose result is reliable. *Id.* In order for the petitioner to succeed in his petition for post-conviction relief, both prongs of the *Strickland* standard must be satisfied. *Id.* Courts, therefore, are not required to address both prongs of the analysis if the petitioner makes an insufficient showing on one. *Id.* at 697.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999)). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Carpenter*, 126 S.W.3d at 887. Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

Criminal defendants have "a right to a correct and complete charge of the law." *State v. Ethan Alexander Self*, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412 at *59 (Tenn. Crim. App. Aug. 29, 2016) (quoting *State v. Hanson*, 279 S.W.3d 365, 280 (Tenn. 2009)) *perm. app. denied* (Tenn. Jan. 19, 2017). The trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *Id.* A jury instruction on general defenses, including self-defense, is not required to be given to the jury "unless it is fairly raised by the proof." *Id.* (citing T.C.A. § 39-11-203(c)).

The Tennessee Supreme Court has established that "sufficient evidence to fairly raise a general defense 'is less than that required to establish a proposition by a preponderance of the evidence.'" *Ethan Alexander Self*, 2016 WL 4542412 at *59 (quoting *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)). The trial court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. *Id.* If the evidence at trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Id.* The trial court's determination of whether to give or withhold a jury instruction is a mixed question of law and fact that this Court reviews de novo without a presumption of correctness. *Id.*

Relevant to the issue here, Tennessee Code Annotated section 39-11-611(b)(2) explains that a person acts in self-defense when the person:

is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury.
(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code. Ann. § 39-11-611(b)(2)(A)-(C).

The petitioner argues the post-conviction court erred when finding appellate counsel effective despite his failure to challenge the denial of the petitioner's request for a self-defense jury instruction on appeal. The State argues that the proof at trial did not fairly raise the issue of self-defense, so appellate counsel was not ineffective in deciding not to raise the issue. Viewing the evidence in the light most favorable to the petitioner and drawing all reasonable inferences in his favor, we agree with the State.

The testimony at trial was that the victim, an unarmed security guard, reported to work at the Southland Mall on February 27, 2010, around 2:00 in the afternoon. The victim was wearing his uniform, with clear markings indicating he was a security guard. Shortly after arriving at work, the victim responded to an emergency call related to a gang fight in the Mall. Testimony from Tywaun Bonds and Justin Jenkins established that the petitioner was involved in the initial gang altercation. The petitioner was a member of the "Goon Squad" gang and was involved in a fight with member(s) of a rival gang, the "Fam Mob." Multiple witnesses testified that the petitioner was running through the mall when the victim attempted to detain him. The two struggled until the victim was able to pin the petitioner against a "wind machine" booth. The petitioner's friend, Jeren Rutherford, approached the petitioner and victim and uttered some variation of "Let my N[*****] go." Rutherford testified that the victim had fear in his eyes. The victim released the petitioner. All of the witnesses who testified agreed that the petitioner then pulled a 9-millimeter handgun from his pocket and fired one shot into the victim's chest. At the time the petitioner fired the fatal shot, he and the victim were separated by several feet. Ellen Thomas testified the victim was standing still with his hands at his side when the petitioner fired his weapon. The victim died shortly thereafter, and the petitioner fled the mall.

The petitioner was apprehended while hiding in the attic of a home in Shelby County. When officers attempted to place the petitioner in handcuffs, he struck one officer in the face and kicked the officer in the chest.

The record reflects the petitioner made multiple statements to police. In his initial oral statement he alleged that he did not fire the gun, but was simply there at the scene. The petitioner never said he acted in self-defense or was in fear of his life.

It is clear from the record that the defense's strategy was to cast doubt on the prosecution's evidence and establish that the shooting was an accident. The trial court determined after considering all of the evidence in the light most favorable to the defendant that the proof did not fairly raise the issue of self-defense, so an instruction was not warranted.

In denying the petitioner's motion for new trial, the trial court again concluded that the evidence did not warrant a self-defense instruction. Likewise, after reviewing the record, the post-conviction court agreed, stating, "This Court reviewed the trial transcript and likewise finds that the issue of 'self-defense' was not raised by the proof in any form even in a light most favorable to the petitioner."

Taking the evidence in the light most favorable to the petitioner, and drawing all reasonable inferences in the petitioner's favor, we affirm the judgment of the post-conviction court and hold that the evidence did not fairly raise the issue of self-defense. Because the proof did not necessitate a self-defense jury instruction, the absence of the instruction did not prejudice the petitioner. Further, because the issue omitted by appellate counsel on appeal was without merit, the petitioner cannot succeed in his ineffective assistance claim. Accordingly, the petitioner received effective assistance of counsel and is not entitled to relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
THOMAS T. WOODALL, PRESIDING JUDGE